[No. A057897. First Dist., Div. Four. Feb. 17, 1993.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al., Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION et al., Defendants and Respondents;
CALIFORNIA TRANSPORTATION VENTURES, INC., et al., Real Parties in Interest.

**COUNSEL**

Dennis F. Moss for Plaintiffs and Appellants.

William M. McMillan, Charles E. Spencer, Joel G. Philipp and Bruce A. Behrens for Defendants and Respondents.

O'Melveny & Myers, Ralph W. Dau, Peter B. Ackerman, Robert L. Soza, Nossaman, Guthner, Knox & Elliott, Stephen N. Roberts, Geoffrey S. Yarema, Alan D. Miller and Joseph M. Keene for Real Parties in Interest.

## OPINION

ANDERSON, P. J.—In 1989 our Legislature enacted an urgency measure empowering the California Department of Transportation (Caltrans) to contract with private developers to construct and operate tollway facilities under lease agreements with the state. (Assem. Bill No. 680 (1989-1990 Reg. Sess.), enacted as Stats. 1989, ch. 107, pp. 1017-1019, eff. July 10, 1989.)[1] This legislation arose from a legislative determination that "[p]ublic sources of revenues to provide an efficient transportation system have not kept pace with California's growing transportation needs, and alternative funding sources should be developed to augment or supplement available public sources of revenue." (Stats. 1989, ch. 107, § 1, subd. (b), p. 1018.) The Legislature envisioned that privately financed projects could "[t]ake advantage of private sector efficiencies" and "[m]ore quickly bring reductions in congestion in existing transportation corridors." (Stats. 1989, ch. 107, § 1, subd. (e), p. 1018.) Finally, through authorized demonstration projects, Caltrans could test the feasibility and efficiency of the private financing and construction model. (Stats. 1989, ch. 107, § 1, subd. (f), p. 1018.)

Pursuant to the enabling legislation, in 1990 Caltrans entered into contracts with four entities for development and construction of the four demonstration projects. Appellants[2] sought extraordinary, injunctive and declaratory relief in a multifaceted challenge to Caltrans's constitutional and statutory authority to enter into these agreements. The trial court analyzed each challenge in a thorough statement of decision and entered judgment denying the requested relief; this appeal followed. We have looked anew at the perceived illegalities and find no defect in either the agreements or the enabling statute. Accordingly, we affirm the judgment in its entirety.

---

[1] Section 1 of Assembly Bill No. 680 is uncodified; section 2 is codified as section 143 of the Streets and Highways Code. Unless otherwise noted, all statutory references are to the Streets and Highways Code.

[2] Appellants are (1) Professional Engineers in California Government, a labor organization which represents engineers employed by the State of California, and (2) Richard Baker and Bruce Blanning, California taxpayers and residents of Northern and Southern California, respectively.

## I. BACKGROUND

### A. *Statutory Scheme*

Section 143 specifically authorizes Caltrans to "solicit proposals and enter into agreements with private entities, or consortia thereof, for the construction by, and lease to, private entities of four public transportation demonstration projects, at least one of which shall be in northern California and one in southern California." (§ 143, subd. (a).) Facilities constructed pursuant to the agreements would at all times be owned by the state and the state in turn would lease them to the private developers for up to 35 years. (§ 143, subd. (b).) During the lease term the developer would operate the facility and collect tolls to be applied to payment of its capital outlay, costs, and a reasonable rate of return on investment. (§ 143, subd. (d).) The facility would revert to the state upon expiration of the lease. In order to implement the statutory directives, Caltrans is authorized to "exercise any power possessed by it with respect to the development and construction of state transportation projects." (§ 143, subd. (c).)

### B. *The Agreements*

In response to its mandate, Caltrans solicited proposals for the demonstration projects, selected four entities, and entered into contracts with each. They are: California Toll Road Company (CTRC), for an 85-mile expressway between Sunol and Vacaville; National Toll Road Authority Corporation, for an 11-mile extension of Route 57 in Orange County utilizing the Santa Ana River Flood Control Channel; California Private Transportation Corporation for a 10-mile, 4-lane road in the median of Route 91 from the Riverside County line to Route 55 in Orange County; and California Transportation Ventures, Inc., for a 10-mile limited access highway in San Diego County.

Each contracting party modified its initial agreement after the trial court announced its tentative decision finding the agreements legally sound except for certain "provisions interfering with the future independent judgment and recommendations of Caltrans." These the court determined were unauthorized and contrary to public policy The court then determined that the amendments cured the objectionable provisions.

## II. DISCUSSION

### A. *The Agreements Do Not Represent an Unconstitutional Abdication by the State of Its Police Powers*

Each agreement designates a "franchise zone," "absolute protection zone" or "non-competition zone" along corridors of the proposed facilities. Within

these zones, Caltrans grants certain exclusive development rights to the project sponsors. In particular, Caltrans agrees not to issue any competing franchise or open or operate any competitive transportation facility within the special zone for the term of the lease or agreement.

Appellants object that these noncompetition provisions amount to a contracting away, for some 35-plus years, of the state's police powers to determine how land should be used to serve the health and general welfare of the community within the franchise zones.

Without question, "the government may not contract away its right to exercise the police power in the future" and an agreement attempting to do so is "invalid and unenforceable as contrary to public policy." (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546].)

A turn of the century case involving a cemetery association's continued right to make interments on certain property is instructive. There, the plaintiff association argued that since the city and county had granted land to it for purposes of a cemetery, and knew of and acquiesced in the cemetery's establishment and existence for many years, the city was estopped to enforce an ordinance preventing the interment of dead bodies within its borders. (*Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464, 475 [93 P. 70].) To this the court said: "Even if the city and county had made an express contract granting to the plaintiff the right to make interments in this ground in perpetuity, such contract would have no force as against a future exercise by the legislative branch of the government of its police power. [Citation.] This power cannot be bargained or contracted away, and all rights and property are held subject to it. [Citations.] The alleged estoppel relied on can have no greater force than would a contract such as the one supposed." (*Id.*, at pp. 475-476.)

The agreements here do not expressly bargain away the state's police power to legislate for the welfare and safety of its people. Instead, Caltrans has granted real parties in interest certain exclusive development rights within certain franchise zones. We will not read into the contracts an abrogation of the potential future exercise of the sovereign police power. However, we emphasize, as did the trial court below, that the reservation of this power is implicit in all government contracts and private parties take their rights subject to it. Thus, within constitutional boundaries of procedural due process, just compensation for the taking of private property and the like, all private contractual rights must give way to compelling state necessity. For instance, were a legitimate, compelling

public need to arise for a transportation facility within a franchise zone that would compete with one of the demonstration projects, the Legislature, acting to attain this public welfare object, could use its power of eminent domain to condemn the franchise. (Code Civ. Proc., § 1230.010 et seq.; *City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 64-68 [183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208].) The trial court recognized this, as do real parties in interest. The agreements do not attempt to abrogate the police power.

Finally, were we to follow appellants' argument to its logical conclusion, *all* exclusive franchises would be void because any granting of exclusive rights inherently precludes other approaches to the problem. When granted explicitly, the validity of exclusive franchises for provision of public services and benefits is well settled. (See, e.g., cases concerning refuse removal and waste handling: *Gurtz* v. *City of San Bruno* (1935) 8 Cal.App.2d 399, 400-401 [48 P.2d 142]; *Tom Hudson & Associates* v. *City of Chula Vista* (9th Cir. 1984) 746 F.2d 1370, 1375; *G. Fruge Junk Co.* v. *City of Oakland* (N.D.Cal. 1986) 637 F.Supp. 422, 424.)

### B. *California's Civil Service Laws Do Not Preclude the State From Contracting Out to Private Parties the Design and Operation of Toll Roads*

Article VII of the California Constitution establishes a system of civil service employment for state government: "The civil service includes every officer and employee of the State except as otherwise provided in this Constitution." (Cal. Const.,[3] art. VII, § 1, subd. (a).) The hallmark of our civil service system is that appointments and promotions are based on merit ascertained by competitive examination. (Art. VII, § 1, subd. (b).)

■ The purposes of article VII as disclosed in the ballot argument of its predecessor provision are twofold: (1) to encourage efficiency and economy in state government, and (2) to eliminate the "spoils system" of political patronage by ensuring that demonstrated fitness—rather than political considerations—spurs all appointments to public service. (*California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 846-847 [245 Cal.Rptr. 232].)

■ Although article VII does not expressly limit the state's ability to contract with private firms for provision of state services, courts have implied certain limits as essential to protect the civil service mandate against dissolution and destruction. (See 199 Cal.App.3d at p. 844 and cases cited

---

[3]All further article references are to the California Constitution.

therein.) Typically courts have articulated tests for determining whether employment of non-civil-service personnel violates these implied limitations. For example, under the "nature of the services test" the court inquires as to whether the nature of the contracted services is such that they could have been performed by a civil servant. If so, the agency must proceed under the civil service mandate. (*State Compensation Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126, 135 [69 P.2d 985, 111 A.L.R. 1503]; *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 395 [86 Cal.Rptr. 305].) Under the "new state function" test, courts will ask whether the contracted services displace existing state civil service functions or, instead, embrace a new state activity or function. The constitutional policy of a merit employment system "does not prohibit legislative experimentation in new forms to fit new functions." (7 Cal.App.3d at p. 399, upholding the statutes and resulting contract calling for private carriers to conduct administrative tasks of the Medi-Cal program.)

■ Appellants' most fundamental contention below was that the agreements contemplate that the developers will contract out civil service work on state highways, in contravention of article VII. Further, to the extent section 143 itself permits design of state highways by the private sector, they maintain it also is unconstitutional.

Without question Caltrans engineers could design the roads in question and other civil servants could construct them. Nor are the design and construction of roads, new state functions or activities. But appellants take too literal an approach when they say that the demonstration projects do not translate into a new state function under *Williams*. As the trial court correctly pointed out, the novelty of the contracts and legislation lies in the privatization of project financing and management. After all, the private sector, not the state, will pay for the services engaged pursuant to the exclusive franchise agreements.

Under section 143 and the agreements, the state is embarking on a new experimental program enlisting private financing, design, construction and operation of transportation facilities to solve state transportation needs that cannot be met with available public revenue. We agree with the trial court that the constitution does not discourage this experimentation.[4] Indeed, to strike down these efforts would denigrate a key purpose of the civil service

---

[4]The trial court correctly observed as follows: "No case has ever suggested that article 7, section 1 restricts the use of private funds, or prohibits the State from transferring what theretofore had been a state function to private hands if public funds are not used to pay for the project. Such a restriction would be inconsistent with one of the objectives underlying the constitutional provision—to promote efficiency and economy in state government. . . ."

mandate—to promote efficiency and economy in state government. Of course these efficiencies and economies remain to be proven, but the very purpose of the demonstration projects is to explore the feasibility of the private financing/management approach.

While arguably the letting of any service contract or franchise might "open[] the door to the spoils system," the Legislature can adopt other measures to prevent such abuse. (*California State Employees' Assn.* v. *Williams, supra,* 7 Cal.App.3d at pp. 399-400.) We will not construe article VII as prohibiting a government contract for performance of services just because of a lurking potential for political favoritism.

■ In a related vein appellants also argue that the contracts violate (1) Government Code section 19130, subdivision (a), detailing standards for the permissible use of "cost-savings" personal services contracts, and (2) Government Code section 19131, requiring that the contracting agency notify the state personnel board whenever it proposes to execute such a contract. The trial court correctly determined that these provisions do not apply to the franchise agreements.

Appellants glance only at a piece of the pertinent legislation, ignoring the definition of "personal services contracts" which specifically *excludes* public works contracts. (Cal. Code Regs., tit. 2, § 279.1.) The public transportation demonstration projects authorized by section 143 are "public works" (Lab. Code, § 1720, subd. (f)) and, thus, the contracts designed to effect those projects are "public works contracts," not "personal services contracts."

Moreover, assuming these statutes had any applicability, the contracts would be permitted under Government Code section 19130, subdivision (b)(2), which provides: "Personal services contracting shall also be permissible when any of the following conditions can be met: [¶] . . . [¶] (2) The contract is for a new state function and the Legislature has specifically mandated or authorized the performance of the work by independent contractors." This is a codification of the "new state function" test discussed above. We note that the Legislature specifically authorized Caltrans to "solicit proposals and enter into agreements with private entities" to construct the demonstration projects. (§ 143, subd. (a).) These projects enable Caltrans to expand its functions and activities to "[t]ake advantage of private sector efficiencies in designing and building transportation projects" (Stats. 1989, ch. 107, § 1, subd. (e)(1), p. 1018) by entering into franchise agreements with private developers. Without regard to the fact that the instant agreements are excluded altogether from the purview of Government Code

section 19130 because they are public works contracts, the explicit requirements of subdivision (b) are met.

### C. The Granting of Airspace Leases Does Not Exceed the Scope of Authority Permitted Under Section 143

Section 143, subdivision (b), provides in part: "For the purpose of facilitating those projects, the agreements may include provisions for the lease of rights-of-way in, and airspace over or under, state highways, for the granting of necessary easements, and for the issuance of permits or other authorizations to enable the private entity to construct transportation facilities supplemental to existing state-owned transportation facilities."

Three of the agreements grant the developer an option to lease airspace for $1 per year, with adjustment to a market rate after 35 years. The fourth agreement contemplates a right of first offer and first refusal for the development and operation of airspace improvements. The airspace leases give the developers the right to construct commercial improvements or to sublease the airspace to third parties for such purposes. Income which the developers may enjoy under airspace leases and subleases is excluded from the calculations establishing limits on profit which the developers can retain from receipt of tolls. However, the cost of improvements erected within the airspace is also excluded from the investment base against which the maximum rate of return is measured.

 Appellants complain that Caltrans's grant of airspace rights to the developers exceeds the scope of authority permitted under section 143, subdivision (b). Their primary contention is that the statute only permits airspace leases along *existing* state highways for physical or operational supports which facilitate actual project construction; in their view the Legislature did not intend leases for commercial development along the completed toll roads as an additional financial inducement.

Appellants argue that the lead-in phrase—"for the purpose of facilitating those projects"—supports their narrow interpretation of section 143, subdivision (b). We disagree. As appellants admit, "facilitate" means "to make easier."[5] There is nothing in the language of section 143 further refining the concept of facilitation such that it would exclude making the projects more financially viable and, thus, more attractive to private developers.

Nor does appellants' constricted reading advance any legislative purpose. The $1 per year leases for airspace improvements serve as an additional

---

[5]Webster's New Collegiate Dictionary (9th ed. 1984) page 444.

financial incentive to engage private enterprise in a public-private partnership to improve our state's infrastructure. The end result is the funding and building of transportation facilities otherwise beyond the state's financial means. These airspace leases are in complete harmony with a stated purpose of section 143 to permit and encourage Caltrans "to test the feasibility of building privately funded transportation facilities by developing four demonstration projects." (Stats. 1989, ch. 107, § 1, subd. (f), p. 1018.)

Further, that the statute refers to airspace over "state highways" as opposed to over the "projects" or "transportation facilities" is of no import. The statute does not limit the airspace leases to *existing* state highways, nor can we see any reason consistent with the legislative purposes to imply such a limitation. The proposed transportation facilities, when built, will *be* state highways—at all times the toll roads are to be state owned and are classified as part of the state highway system. (§ 143, subds. (b), (e).)

We also part ways with appellants on their argument that the closing prepositional phrase of the relevant sentence in section 143, subdivision (b)—"to enable the private entity to construct transportation facilities supplemental to existing state-owned transportation facilities"—aids their cause.[6] ■ To begin with, our rules of construction instruct that qualifying or modifying phrases refer to immediately preceding words or phrases rather than to more remote ones, unless the context or evident meaning requires a different interpretation (*Oliva* v. *Swoap* (1976) 59 Cal.App.3d 130, 138 [130 Cal.Rptr. 411].) ■ The phrase in question grammatically modifies only the third item (permits and authorizations) in a series of three: it comes immediately after the third item which itself is separated by commas from the first two items (leases of rights of way and airspace and grants of easements). Additionally, even if we read this clause as modifying the airspace lease clause, the resulting meaning would not foreclose the airspace options included in the franchise agreements. As we have explained, as a financial inducement the options provide a "means or opportunity" to engage the private sector in constructing public highways.[7]

Appellants also seem to be suggesting that the airspace lease provisions are invalid because any profit generated from airspace development is not part of the allowance under the statute for a "reasonable return on investment" to the private developer. Section 143, subdivision (d), specifies how

---

[6]They actually refer to a nearly identical phrase in the Legislative Counsel's Digest. (See Legis. Counsel's Dig., Assem. Bill No. 680, 4 Stats. 1989 (Reg. Sess.) Summary Dig., pp. 43-44.)

[7]"Enable" means "to provide with the means or opportunity," "to make possible, practical, or easy." (Webster's New Collegiate Dict., *supra*, p. 409.)

toll revenues are to be applied, and allows the developer a reasonable return on its investment.[8] Yet, nothing in the statute indicates that the Legislature intended for developers to derive a profit solely from tolls, or similarly that Caltrans could not exclude revenues *and* costs relating to developing airspace from the formulaic limits on these profits.

In this regard we note that section 143 gives Caltrans broad discretion to carry out the statute's purposes: "The department may exercise any power possessed by it with respect to the development and construction of state transportation projects to facilitate the development and construction of transportation projects pursuant to this section." (§ 143, subd. (c).) Of significance are (1) the broad reservation of incidental powers retained by the department under the code: "The department may do any act necessary, convenient or proper for the construction, improvement, maintenance or use of all highways which are under its jurisdiction" (§ 92); (2) the broad grant of statutory authority to "make and enter" contracts "as are required for the performance of its duties" (§ 94); and (3) the charge to develop "in cooperation with local and regional transportation entities, the full potential of all resources and opportunities which are now, and may become, available to the state and to regional and local agencies for meeting California's transportation needs" (Gov. Code, § 14030, subd. (c)). Without question, this myriad authority empowers Caltrans to grant airspace lease rights for commercial development along the toll roads. Such grants advance the private sector's involvement in developing and constructing highways and enhancing their use.

Finally, the initial nominal value placed on the airspace is not unreasonable. First, the developers will be purchasing (or paying condemnation awards) for the underlying real property encompassed within the right-of-way of the facilities. Thus, the "grant" of airspace rights is little more than a retention or reservation of development rights by the purchaser. Second, the trial court correctly observed that Caltrans's agreement to enter airspace leases is but one of many covenants running from Caltrans to the developers in exchange for the numerous obligations and commitments which the

[8]Section 143, subdivision (d), reads in part: "Agreements entered into pursuant to this section shall authorize the private entity to impose tolls for the use of a facility constructed by it, and shall require that over the term of the lease the toll revenues be applied to payment of the private entity's capital outlay costs for the project, the costs associated with operations, toll collection, administration of the facility, reimbursement to the state for the costs of maintenance and police services, and a reasonable return on investment to the private entity. The agreement shall require that any excess toll revenue either be applied to any indebtedness incurred by the private entity with respect to the project or be paid into the State Highway Account, or both."

developers have undertaken. The consideration accruing to the state is a package of commitments to which the nominal $1 is added as is the potential market rate rentals which could accrue to the state after 35 years and after *the developers* have invested substantial private capital in airspace improvements. Any value which the leases may eventually produce results from the developers' own investment. Moreover, as Caltrans represented at trial, other airspace leases which it has entered into have failed to generate significant revenue. Thus the airspace rights represent only a modest, and speculative, potential margin of profitability. Compared with the risks the project sponsors are assuming, the airspace lease provisions are reasonable.

For all these reasons we conclude section 143 neither prohibits Caltrans from committing to airspace leases for commercial improvements to facilitate the project nor establishes financial limitations on such leases.

### D.    *The Lease Terms of the Mid-State Tollway Agreement Are Within the Spirit and Letter of Authority Granted by the Implementing Legislation*

The proposed Mid-State Tollway is an ambitious undertaking for construction of an expressway linking Interstate 80 near Vacaville with Interstate 680 near Fremont. Because of the scope and complexity of this tollway, Caltrans's agreement with CTRC allows for phased construction of the project, with a separate 35-year lease for each separate portion or "facility." The CTRC contract defines "facility" as "a separately developed and construction transportation facility which shall comprise a part of the Project and which shall be operated in accordance with this Agreement and a Facility Lease Agreement."

CTRC's franchise terminates on the 35th anniversary of the "transfer date"[9] of the second facility. Construction of the second facility need not commence until the 10th anniversary of the transfer date of the first facility. Hence, the franchise itself could extend for more than 45 years.

Appellants' last sally against the agreements converges on the multi-lease aspect of the CTRC contract. They charge that the Mid-State Tollway agreement "subverts" the legislative intent of section 143 by creating a "fifth" demonstration project when the statute only calls for four.

True, section 143 authorizes agreements with private developers for *four* demonstration *projects*. (§ 143, subd. (a).) It also sets a 35-year limit on the

---

[9]The "transfer date" is "the date (i) by which complete Title to a Facility shall have been transferred to Caltrans and Developer and Caltrans shall have executed and delivered a Facility Lease Agreement for such Facility, and (ii) on which such Facility Lease Agreement becomes effective and Developer commences operation of such Facility for the collection of toll revenues."

*facility* leases. (§ 143, subd. (b).) Thus, the statute speaks of both "projects" and "facilities," without specifying whether a given demonstration project can consist of one or more facilities. The trial court found the statute ambiguous on this point but resolved that the CTRC agreement comported with the statutory authorization. It emphasized that the Legislature intended to encourage private construction of toll roads, not to cramp this goal with a strained reading of the enabling legislation.

We agree. The statutory lease term relates to each facility, not to a project. The statute does not forbid more than one facility per project, and one could argue it affirmatively permits multiple facilities by the following language: "Facilities constructed by a private entity pursuant to this section shall, at all times, be owned by the state. The agreement shall provide for the lease of those facilities to the private entity for up to 35 years." (§ 143, subd. (b).)

Under the Mid-State Tollway contract, no individual facility lease exceeds 35 years. In any event, while section 143 is not crystal clear on the multiple-facility, multiple-lease point, we construe the statute as permitting both. The treatment of separate phases and segments as discrete aspects of the overall demonstration project is in harmony with the legislative intent to test private funding mechanisms for public infrastructure projects.

The judgment is affirmed.

Poché, J., and Perley, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 13, 1993. Mosk, J., Panelli, J., and Kennard, J., were of the opinion that the petition should be granted.