[No. D025554. Fourth Dist., Div. One. Mar. 26, 1998.]

COUNTY MOBILEHOME POSITIVE ACTION COMMITTEE, INC.,
Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO et al., Defendants and Respondents.

COUNSEL

Richard I. Singer and Elvi J. Olesen for Plaintiff and Appellant.

Seltzer, Caplan, Wilkins & McMahon, Julie P. Dubick and Virginia C. Pearson for Defendants and Respondents.

OPINION

**HUFFMAN, Acting P. J.**—County Mobilehome Positive Action Committee, Inc., an association of mobilehome owners and renters· of spaces at mobilehome parks (COMPAC), appeals the summary judgment entered against it upon cross-summary-judgment motions that addressed the constitutionality of an ordinance enacted by defendant and respondent County of San Diego (the County), pursuant to a proposal by an association of mobilehome park owners, defendant and respondent San Diego County Park Industry Association (the Association) (sometimes collectively the respondents). (Code Civ. Proc., § 437c.) This ordinance (San Diego County Ord. No. 8405), codified at title 5, division 10, section 510.101 et seq. of the San Diego County Code of Regulatory Ordinances Relating to the Standard Mobilhome Park Accord (the ordinance),[1] attached as appendix A, *post*, essentially imposed a county moratorium upon the enactment of any rent control legislation for a period of 15 years pursuant to an accord reached between the County and the Association's members. This contractual accord (the Accord) created a standard 15-year lease to be offered to renters by Association members, containing certain rent stabilization and related measures that were conditioned upon the County's refraining from enacting rent control legislation affecting those Association members who signed the Accord.

On appeal, COMPAC argues the ordinance and the related Accord represent an unconstitutional limitation upon the power of the County's governing body (in particular, future county boards of supervisors) to exercise the County's police power as they deem appropriate under circumstances which may exist in the future. COMPAC relies on California Constitution, article XI, section 7, granting counties and cities the power to make and enforce ordinances pursuant to their police power, to the extent there is no conflict with general law. It also relies on case law to the effect that ". . . the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Avco Community Developers, Inc.* v. *South Coast*

---

[1]Hereafter, specific provisions of the ordinance will be referred to by section number only.

*Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*).) Finally, it makes an extensive argument that the ordinance is invalid, based on preemption theory.

Without reaching the preemption question, we agree with COMPAC that the ordinance impermissibly restricts the power of future county boards of supervisors to respond to then extant circumstances in the pertinent area of exercise of the police power, mobilehome rent regulation. Accordingly, the ordinance and the Accord contract are invalid to that extent. The trial court will be directed to vacate its order granting the County's and the Association's summary judgment motion, and to issue a different order granting that of COMPAC.

### FACTUAL AND PROCEDURAL BACKGROUND

The background facts are set forth in COMPAC's complaint for declaratory relief as to the validity of the ordinance.[2] (Appen. A, *post*.) Approximately one-third of the County's 93,000 mobilehome park residents live in parks that are located in unincorporated areas of the County and are thus subject to County jurisdiction. In 1993, COMPAC lobbied the County Board of Supervisors (the Board) to enact mobilehome rent control which would place restrictions on the size and frequency of rent increases. No such ordinance was enacted.

About the same time, a number of park owners formed the Association and proposed their own solution to the dispute, which was eventually accepted by the Board. Their proposal consisted of the ordinance providing that individual park owners could enter into a contract with the County (the Accord), agreeing to offer their tenants a standard mobilehome park space lease which would be approved by the Board. This "Accord Lease" provided for annual rent increases (or decreases) based on the consumer price index and numerous allowable pass-throughs for utilities, taxes, and so forth; no limitations were placed on the initial allowable rent. Provisions were made for relocation and rental assistance. The specified lease term of the Accord lease was 15 years. It specifies in its first paragraph: "Rent Control Exemption: THIS LEASE WILL BE EXEMPT FROM ANY ORDINANCE, RULE, REGULATION OR INITIATIVE MEASURE ADOPTED BY ANY LOCAL GOVERNMENTAL ENTITY WHICH ESTABLISHES A MAXIMUM AMOUNT THAT A LANDLORD

---

[2]The parties submitted declarations below; COMPAC's from its president and the respondents' from law professor Bernard Siegan. The trial court did not rely on the declarations, instead reviewing the ordinance on its face and ruling on its validity accordingly. We do likewise. The trial court also did not find it necessary to rely on an unpublished opinion submitted by respondents as persuasive authority; we also disregard that matter.

MAY CHARGE A TENANT FOR RENT. The provisions of this Lease will set the terms of rent between the Park and the Homeowner(s). [(Civ. Code, § 798.17)]"[3]

The accompanying ordinance provided at section 510.104 that the County would not enact rent control for 15 years with respect to any park whose owner had executed the accord agreement and who thus offered the Accord lease to his or her park residents. (Appen. A, *post*, at p. 743.) No requirement was made that any of the park residents had to accept the Accord lease. The Accord specifically provided: "To the extent that any provision or condition in this accord is ever inconsistent during the duration of this Accord with any other action taken by County, including, without limitation, any policy regulation, rule or ordinance, this Accord shall govern."

Concurrently, the Association agreed to indemnify the County for legal fees if legal action should take place challenging the accord arrangement.[4]

In May 1994, the Board enacted the ordinance by a vote of three to two, and entered into the Accord. COMPAC then brought its complaint for declaratory relief, alleging the ordinance and the Accord were an attempt by the park owners and the present Board to disable all future boards of supervisors from exercising their constitutionally mandated powers for 15 years, in violation of constitutional protections against a governmental entity bargaining away its power to enact legislation to protect the health, safety or welfare of the people it governs. Cross-summary-judgment motions were brought and the one by the County and the Association was granted, the trial court ruling: (1) the ordinance was a valid, reasonable, and legitimate exercise of the County's police power to enact legislation tantamount to rent control; (2) the ordinance did not prevent the exercise of the County's police power, because the ordinance could be repealed, amended or superseded at any time by the current or future boards of supervisors; (3) there was no preemption problem. Judgment was entered for the County and the Association. COMPAC brought a new trial motion focusing on the preemption argument; the motion was denied. COMPAC appeals the judgment.

---

[3]Respondents consistently argue the Accord and ordinance constitute some form of rent control, as they together provide for "rent stabilization" (through use of the cost of living index) and certain rental and relocation assistance benefits to be offered to residents (although the Accord and ordinance nowhere require that the standard Accord lease be accepted by any residents to make the Accord effective, nor that the initial rent amount to be charged be regulated in any way by the Accord). The standard space lease states in bold type that no rent control enactments apply to the space. When the Accord documents are read together, they provide an alternative regulatory scheme that cannot reasonably be said to constitute "rent control" as usually defined (e.g., including rent ceilings or controls; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 142-143 [130 Cal.Rptr. 465, 550 P.2d 1001]).

[4]The trial court struck allegations in the complaint that this indemnification agreement constituted a bribe to County officials for entering into the accord arrangement.

## DISCUSSION

### I

### *Standards of Review*

■ Where, as here, there is no substantial evidentiary dispute over the facts which underlie a statutory interpretation question, the appellate court reviews the issue de novo, independent of the trial court's ruling or rationale. (*Building Industry Assn.* v. *City of Oceanside* (1994) 27 Cal.App.4th 744, 771 [33 Cal.Rptr.2d 137].) COMPAC is arguing the ordinance is facially unconstitutional as an attempt to delegate and restrict the exercise of legislative powers by contracting them away. ■ In testing the validity of a statute against such a challenge, these stringent rules apply: "In determining a statute's constitutionality, we start from the premise that it is valid, we resolve all doubts in favor of its constitutionality, and we uphold it unless it is in clear and unquestionable conflict with the state or federal Constitutions. [Citation.] A challenge to a statute's constitutionality must demonstrate that its provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions. [Citation.] The corollary to the challenger's burden is that if the court can conceive of a situation in which the statute can be applied without entailing an inevitable collision with constitutional provisions, the statute will prevail. [Citation.] A statute is not facially unconstitutional simply because it may not be constitutionally applied to some persons or circumstances; at a minimum its unlawful application must be substantial and real when judged in relation to the statute's plainly legitimate sweep. Unless it is in total conflict with the Constitution, any overbreadth is cured by a case-by-case analysis of the particular fact situation. [Citation.] A statute will be declared invalid in its entirety only when its scope cannot be limited to constitutionally applicable situations except by reading in numerous qualifications and exceptions, i.e., rewriting it, or if it is invalid in certain situations and cannot be enforced in others without danger of an uncertain or vague future application. [Citation.]" (*Mounts* v. *Uyeda* (1991) 227 Cal.App.3d 111, 122 [277 Cal.Rptr. 730].)

■ In reviewing challenges to the decisions of legislative bodies, courts do not inquire into the motives of lawmakers or interfere with the legislative process. (*City of Santa Cruz* v. *Superior Court* (1995) 40 Cal.App.4th 1146, 1150-1151 [48 Cal.Rptr.2d 216].) Applying these standards, we first examine the respondents' theory that there can be no defect in such a law to the extent it sets a time period in which no legislation on the subject may take place, since the law is necessarily subject to potential future repeal or

revocation by the enacting body; does the possibility of repeal obviate any invalidities found? Next, we discuss the rules relating to the proper exercise of police power. Finally, we analyze the scope of the ordinance and the related Accord in light of applicable authority.

## II

### *Rules Governing Legislative Enactments*

■ State and local legislative bodies have the power and discretion to determine what legislation is necessary and appropriate to accomplish the public good. (13 Cal.Jur.3d (rev.) Constitutional Law, § 113, pp. 260-261, and cases cited.) The state has no power to take over areas of regulation (local, police, and sanitary regulations) that the constitution has allocated to local entities. (*Ex parte Daniels* (1920) 183 Cal. 636, 641 [192 P. 442, 21 A.L.R. 1172].) The courts do not control legislative discretion except to the extent of determining if legislation is unconstitutional. (13 Cal.Jur.3d, *supra,* § 113, pp. 260-261.)

■ It is clear that one legislative body cannot restrict the powers of its successors by enacting legislation which is purported to be nonrepealable. In *County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 589-590 [159 Cal.Rptr. 1], this discussion is set forth: "[A]n act of one legislature is not binding upon, and does not tie the hands of future legislatures. [Citation.] In Lewis' Sutherland Statutory Construction, vol. 1, sec. 244, pages 456, 457, the rule is thus stated: [¶] ' "Every legislative body may modify or abolish the acts passed by itself or its predecessors. This power of repeal may be exercised at the same session at which the original act was passed; and even while a bill is in its progress and before it becomes a law. The legislature cannot bind a future legislature to a particular mode of repeal. It cannot declare in advance the intent of subsequent legislatures or the effect of subsequent legislation upon existing statutes." ' (*United Milk Producers* v. *Cecil* (1941) 47 Cal.App.2d 758, 764-765 [118 P.2d 830].)" (See also *In re Collie* (1952) 38 Cal.2d 396, 398 [240 P.2d 275].)

Our task is to examine the ordinance, section 510.104 in particular, as follows, with these rules in mind: "The County hereby covenants and agrees with any park owner signing and adhering to the Accord that the County will not adopt any ordinance, rule, regulation, or initiative measure which would

regulate the amounts that any mobilehome park owner who signs an Accord may charge any Resident for Rent." (Appen. A, *post*, at p. 743.)[5]

The Accord entered into by the County and the Association then specifies that the duration of the Accord is 15 years, and the Accord shall govern over any inconsistent action taken by the County, such as the enactment of any ordinance or regulation. Thus, the ordinance itself does not specify any time period, but the Accord referenced by the ordinance does. Based on this structure of the Accord and ordinance, we may preliminarily conclude that (1) the ordinance does not on its face, nor could it, restrict the County from repealing the ordinance and then enacting any legislation deemed appropriate in the future; (2) the County could legitimately decide not to enact legislation on rent control at the present; (3) however, here the situation is different, in that the County has contractually agreed not to enact rent control legislation for 15 years, the period of the Accord, as to signatories to the Accord. The ordinance does not expressly set a time in which no rent control will be enacted; however, when the Accord and ordinance are read as a whole, the parties have agreed as such, thus exposing the County to potential breach of contract damages if the Accord were breached.

We conclude from this state of affairs that the issue presented is not resolved by the rules on repeal because the mere fact that repeal is potentially available would not save an enactment that is currently unconstitutional for other reasons. We thus are required to resolve the police power issue on the merits and not to avoid the issue by saying the repeal possibility is a sufficient cure for any other defects in the ordinance.

III

*Police Power*

A

*Authority*

California Constitution, article XI, section 7, provides that a county or city may make and enforce within its limits "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." It is not disputed here that rent control generally falls within the police power of

---

[5]One of COMPAC's arguments is that the ordinance may not forbid the enactment of an initiative measure by the voters. Respondents concede a statewide rent control initiative would affect, if not supersede, the ordinance. We need not decide such a hypothetical question at this time.

local governmental entities. (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at pp. 164-165.)

■    As already cited, ". . . the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Avco, supra,* 17 Cal.3d at p. 800.) A contract that does so is invalid and unenforceable as contrary to public policy. (*Ibid.; Delucchi* v. *County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 [225 Cal.Rptr. 43].) Specifically, ". . . a municipality may not 'contract away' its legislative and governmental functions. [Citations.] The effect of the rule, however, is *to void only a contract which amounts to a city's 'surrender,' or 'abnegation,' of its control of a properly municipal function.* [Citations.]" (*Morrison Homes Corp.* v. *City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196], italics added, original italics omitted.)[6]

In determining if the contractual arrangement here exceeds or is inconsistent with the County's powers, additional authority on public contracting must be considered. In *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 362 [139 P.2d 908], the Supreme Court said, "the state cannot abdicate or bargain away its police power even by express grant [citation], *and rights under a so-called 'public' contract are subject to further exercise of the power to which they owe their existence.*" (Italics added.) Similarly, in *Delucchi* v. *County of Santa Cruz, supra,* 179 Cal.App.3d at page 823, the court explained, " ' " "The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citations.] *It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement . . . .*" [Citations.]' [Citations.] [Also applicable is] the long-established rule that a contract must, if possible, be interpreted so as to make it 'lawful, operative, definite, reasonable, and capable of being carried into effect' (Civ. Code, § 1643) . . . ." (Italics added.)

In *Interstate Marina Development Co.* v. *County of Los Angeles* (1984) 155 Cal.App.3d 435, 448 [202 Cal.Rptr. 377], the court referred to the rule that

---

[6]In *Morrison Homes Corp.* v. *City of Pleasanton, supra,* 58 Cal.App.3d at page 733, the court rejected an argument that certain annexation agreements and a " 'sewer commitment' " were void and unenforceable because they represented an invalid " 'attempt to contract away the legislative and governmental functions of future City councils.' "

a governmental entity (there, the state) has no power to enter into binding contracts to refrain from exercising its police power in the future. Explaining that rent control is such an exercise of the police power, the court found no impairment of private lease contracts through rent control laws, relying in part on this authority: " 'The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements. This principle is summarized in Justice Holmes' well-known dictum: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." [Citation.]' [Citation.]" (155 Cal.App.3d at p. 448.)

Case law has discussed analogous situations in which challenges were brought to governmental contract arrangements as improper delegations of police power. For example, in *Alameda County Land Use Assn.* v. *City of Hayward* (1995) 38 Cal.App.4th 1716 [45 Cal.Rptr.2d 752], several governmental entities entered into a memorandum of understanding concerning approximately 13,000 acres of open space, agreeing to use their "best efforts" to adopt into their respective general plans certain specified goals and policies concerning the area. They then agreed that if each respondent's general plan was so amended, any further amendments to their respective plans applicable to the area would specify the amendment would not become effective unless there were parallel amendments adopted by the other entities. (*Id.* at p. 1720.) The appellate court held the agreement invalid, relying on the rule that a local government may not contract away its right to exercise its police power in the future. It stated: "Respondents' agreement, as reflected in paragraph three of the [agreement], that their individual general plan amendments are ineffective unless like amendments are made to the other jurisdictions' general plans is a surrender of each respondent's power to amend its own general plan. This policy divests each respondent, presently and in the future, of its sole and independent authority to amend its respective general plan, by providing outside jurisdictions a veto over such amendments. . . . [¶] . . . [A]s presently drafted the [agreement] constitutes an impermissible divestment by respondents of their power and obligation to enact legislation affecting the lands within their respective jurisdictions." (*Id.* at pp. 1724-1725.)

Similarly, in *City of Glendale* v. *Superior Court* (1993) 18 Cal.App.4th 1768, 1778 [23 Cal.Rptr.2d 305], it was held that a governmental entity could not "abridge by contract its sovereign authority to take property by eminent domain." The court said: "It is well established that governments

cannot divest themselves by contract of the right to exert their governmental authority 'in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties.' [Citations.]" (*Id.* at pp. 1778-1779.)

Another analogous situation arose in *Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585 [16 Cal.Rptr.2d 599] where Caltrans was authorized by statute to " 'solicit proposals and enter into agreements with private entities, or consortia thereof, for the construction by, and lease to, private entities of four public transportation demonstration projects . . . .' ([Sts. & Hy. Code,] § 143, subd. (a).)" (*Professional Engineers, supra,* at p. 590.) Caltrans entered into agreements designating a "franchise zone," "absolute protection zone" or "non-competition zone" along corridors of the proposed facilities, where certain exclusive development rights were granted to the project sponsors. (*Id.* at pp. 590-591.) These agreements were challenged by the appellants (mainly state-employed engineers), on the basis that "these noncompetition provisions amount to a contracting away, for some 35-plus years, of the state's police powers to determine how land should be used to serve the health and general welfare of the community within the franchise zones." (*Id.* at p. 591.) The Court of Appeal rejected this claim, concluding there was no unconstitutional bargaining away of the state's police power to legislate for the welfare and safety of its people, because all government contracts reserved in them the sovereign police power, and the private parties took their rights subject to it. (*Ibid.*) "Thus, within constitutional boundaries of procedural due process, just compensation for the taking of private property and the like, all private contractual rights must give way to compelling state necessity." (*Ibid.*)

In summary, the controlling consideration in this area appears to be whether a disputed contract amounts to a local entity's "surrender," "abnegation," "divestment," "abridging," or "bargaining away" of its control of a police power or municipal function. (*Morrison Homes Corp. v. City of Pleasanton, supra,* 58 Cal.App.3d at p. 734; *Alameda County Land Use Assn. v. City of Hayward, supra,* 38 Cal.App.4th at p. 1725; *Professional Engineers v. Department of Transportation, supra,* 13 Cal.App.4th 585; *City of Glendale v. Superior Court, supra,* 18 Cal.App.4th at pp. 1778-1781.)

B

*Application of Authority*

In light of this authority, we may now consider the entire Accord arrangement to determine if this crucial control element has been lost. The

ordinance's findings state that the Board is exercising its police power by offering each mobilehome park owner within County jurisdiction the opportunity to enter into the Accord, which will provide for rent stabilization, and rental and relocation assistance, in return for the County's promise not to adopt any regulatory measure regarding rent. (Appen. A, *post*, at p. 742.) This promise is enforced by a contractual agreement, the Accord, which park owners may choose to sign or not. (*Id.* at p. 743.) The Accord recites that those park owners who enter into it are doing so in consideration of the County's agreement to refrain from rent control regulation. The Accord twice states they would not do so, nor provide the specified benefits to residents, were it not for the protections to be afforded them through the ordinance. The Accord also states it is intended to preempt any other county ordinance or regulation enacted by the County. The standard space lease is attached to the Accord, clearly stating in bold type that the lease is exempt from any rent control measures. Both the Accord and the standard space lease are for a duration of 15 years.

At oral argument, the trial court and counsel discussed the issue of whether the County was potentially exposed to damages claims if it breached the Accord by repealing the ordinance and enacting rent control legislation. The trial court concluded that issue was not currently before it and did not have to be resolved at that time, as the ordinance could always be repealed and thus did not represent any permanent restriction on the police power.

Respectfully, we believe this analysis misses a crucial point. We first observe that the County specifically retains its police power to regulate rents as to park owners who have not signed the Accord. (§ 510.105; appen. A, *post*, at p. 743.) As to signatories of the Accord, however, the County has attempted to give up such power for 15 years and thus appears to be exposing itself to breach of contract damages if the Accord were breached by the enactment of rent control measures applicable to those parks. Such damages could take the form of the expenses to the park owners of providing the specified benefits to residents under the Accord, or difference in rents before and after regulation, and so forth.

It is true that it cannot be resolved at this time whether such exposure to contract damages is real or illusory, in light of *Interstate Marina Development Co.* v. *County of Los Angeles, supra,* 155 Cal.App.3d at page 448, and similar authority. However, if the ordinance and Accord were repealed and revoked, and rent control legislation enacted, it is arguable and thus litigable that there would be some surviving contract rights of some variety. The vice of this ordinance, as tied to the Accord, is that it chills the County's exercise

of police power for the specified time, even if there are significantly changed circumstances, through such potential exposure to litigation and damages.

The ordinance also conflicts with the County's area of responsibility for police power regulation. By analogy, since the state has no power to take over areas of regulation (local, police, and sanitary regulations) that the Constitution has allocated to local entities (*Ex parte Daniels, supra,* 183 Cal. at p. 641), it seems clear that the local entity should not disable itself from carrying out such regulation for a specific time period, based on private agreement.

Moreover, the ordinance is an effort to delay for 15 years any discretionary compliance with the obligations imposed by California Constitution, article XI, section 7 (providing that a county may make and enforce within its limits "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws") that might be warranted by circumstances that may occur in the coming years. The test we must apply for facial unconstitutionality of a statute or ordinance is whether "its provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Mounts* v. *Uyeda, supra,* 227 Cal.App.3d at p. 122.) Alternatively, the question is whether its scope "cannot be limited to constitutionally applicable situations except by reading in numerous qualifications and exceptions, i.e., rewriting it, or if it is invalid in certain situations and cannot be enforced in others without danger of an uncertain or vague future application. [Citations.]" (*Ibid.*)

Here, the County's effort to distinguish between park owners who have and have not signed the Accord, for purposes of disabling itself from enacting rent control, seems to create a danger of inconsistent application: Residents may be subjected to the County's moratorium on rent control, even though no resident signed the Accord lease, merely because the park owner chose to offer it. Other residents are subject to the 15-year restriction on rent control by agreement, if they signed the Accord lease, but their neighbors who did not sign are also subject to that waiting period. Meanwhile, the County could conceivably be regulating rents in parks where the Accord lease was never offered.[7]

In conclusion, we believe the Accord and the related ordinance represent an express effort by the County to "surrender," "abnegate," "divest,"

---

[7]At oral argument, counsel for the Association and the County noted that some 70 park owners have offered the Accord, but it was not used in the majority of parks (about 130 others).

"abridge," or "bargain away" its control of a police power or municipal function, due to its acceptance of the Association's version of rent stabilization, and due to the possibility of the monetary consequences of any breach of this Accord (whether damages or litigation expenses). (*Morrison Homes Corp.* v. *City of Pleasanton, supra,* 58 Cal.App.3d at p. 734; *Alameda County Land Use Assn.* v. *City of Hayward, supra,* 38 Cal.App.4th at p. 1725; *Professional Engineers* v. *Department of Transportation, supra,* 13 Cal.App.4th 585; *City of Glendale* v. *Superior Court, supra,* 18 Cal.App.4th at pp. 1778-1781.) We conclude the ordinance is facially unconstitutional for this reason and the Accord is invalid to that extent. COMPAC's motion for summary judgment, not that of respondents, should have been granted.

DISPOSITION

The judgment is reversed and the trial court is directed to enter a different judgment denying the County's and the Association's motion for summary judgment and granting that of COMPAC. Costs on appeal to COMPAC.

Nares, J., and Haller, J., concurred.

# APPENDIX A

ORDINANCE NO. 8405 (NEW SERIES)

AN ORDINANCE ADDING DIVISION 10 (COMMENCING WITH SECTION 510.101)
TO TITLE 5 OF THE SAN DIEGO COUNTY CODE OF REGULATORY ORDINANCES
RELATING TO THE STANDARD MOBILEHOME PARK ACCORD

The Board of Supervisors of the County of San Diego ordains as follows:

SECTION 1. Division 10 (commencing with section 510.101) is added to Title 5 of the San Diego County of Regulatory Ordinances to read as follows:

DIVISION 10

STANDARD MOBILEHOME PARK ACCORD

SEC. 510.101. FINDINGS.

a. For the past several years certain residents of mobilehome parks have requested the Board of Supervisors to unilaterally impose rent control on owners of mobilehome· parks.

b. Certain park owners, aware of these requests and the Board of Supervisors' concern with protecting the low and moderate income housing stock in the unincorporated area, have offered to provide by voluntary agreement, rent stabilization 'to their residents and other benefits not required by law, in return for the promise by the County not to adopt any ordinance, rule, regulation or initiative ·measure that would regulate the amounts of rent charged by those owners.

c. The Board of Supervisors finds that imposition of mandatory rent control may well create an expensive bureaucracy, involve the County in endless litigation which could deplete the general fund and polarize residents· and park owners.

d. After careful consideration of the views of all parties to the issue, the Board states that its policy is to exercise its police power by offering each mobilehome park owner in the unincorporated area the opportunity to enter into a Standard Mobilehome Park Accord with the County providing for rent stabilization, subsidies to qualifying residents, relocation assistance and other benefits to residents in return for the County's promise not to adopt any ordinance, rule, regulation, or initiative measure which would regulate the amounts that any park owner who signs an Accord may charge for Rent.

SEC. 510.102. DEFINITIONS. The following definitions shall apply to this Division:

a. Accord. The Standard Mobilehome Park Accord ("Accord") is that form of Accord approved by the Board of Supervisors on March 29, 1994 (Minute Order #59.)

4/6/94 - 9:45am                1

No. 48
5/17/94    **EXHIBIT .A**

b.   <u>Indemnification Agreement</u>.   The Indemnification Agreement is that form of Agreement to·be entered into by the County and the San Diego County Park Industry Association as approved by the Board of Supervisors on March 29, 1994. (Minute Order #59.)

c.   <u>Rent</u>.   "Rent" shall mean the consideration, in connection with the use and occupancy of a mobilehome space, as "mobilehome space" is defined in the Accord, and shall include services, amenities, benefits, taxes, assessments, maintenance and capital improvement pass-throughs and utilities.

d.   <u>Resident</u>.   "Resident" shall mean any person entitled to occupy a mobilehome as "mobilehome" is defined in the Accord and in accordance with California Civil Code Section 798 et seq. (the Mobilehome Residency Law), pursuant to ownership thereof and to agreement with a mobilehome park owner.

SEC.   510.102.   <u>APPROVAL OF INDEMNIFICATION AGREEMENT</u>.   The form and content of the Indemnification Agreement is hereby approved and the Clerk of the Board of Supervisors is authorized and directed to execute the Indemnification Agreement on behalf of the County.

SEC.   510.103.   <u>APPROVAL OF ACCORD AND DIRECTION TO EXECUTE</u>. The form and content of the Accord is hereby approved.  Subject to execution of the Indemnification Agreement by the Park Industry Association, the Clerk of the Board is authorized and directed to enter into the Accord with any park owner within the unincorporated area of the County.   The Director, Department of Housing and Community Development is directed to administer on behalf of the County the provisions of any Accord which may be executed.

SEC.   510.104.   <u>PROMISE BY COUNTY NOT TO REGULATE RENTS OF PARK OWNERS EXECUTING THE ACCORD</u>.   The County hereby covenants and agrees with any park owner signing and adhering to the Accord that the County will not adopt any ordinance, rule, regulation, or initiative measure which would regulate the amounts that any mobilehome park owner who signs an Accord may charge any Resident for Rent.

SEC.   510.105.   <u>COUNTY NOT PRECLUDED FROM REGULATING RENTS OF MOBILEHOME PARK OWNERS WHO DO NOT SIGN THE ACCORD</u>.   Nothing in this Division shall be construed to restrict the ability of the County to adopt any ordinance, rule, regulation, or initiative measure which would regulate the amounts that any mobilehome park owner not a party to the Accord may charge any Resident for Rent.

SEC.   510.106.   <u>TERMINATION OF RIGHT TO SIGN ACCORD</u>.   The right of any mobilehome park owner to execute the Accord shall expire seven months from the effective date of this Ordinance.

ordinanc.v4

4/6/94 - 9:45am                2

00110

Section 2. Effective Date. This ordinance shall take effect thirty (30) days after its adoption. Within fifteen (15) days after the date of adoption of this ordinance, a summary shall be published once with the names of the members voting for and against the same in the San Diego Daily Transcript, a newspaper of general circulation published in the County of San Diego.

PASSED, APPROVED, AND ADOPTED this 17th day of May, 1994.

*Pamela Slater*

PAM SLATER
Chairwoman     of     the     Board     of
Supervisors of the County of San
Diego, State of California

The above ordinance was adopted by the following vote:

| Supervisor Brian P. Bilbray | "AYE" |
| Supervisor Dianne Jacob | "NO" |
| Supervisor Pam Slater | "AYE" |
| Supervisor Leon L. Williams | "AYE" |
| Supervisor John MacDonald | "NO" |

ATTEST my hand and the seal of the Board of Supervisors this 17th day of May, 1994.

THOMAS J. PASTUSZKA
Clerk of the Board of Supervisors

By _Maritza C. Steele_
        Maritza C. Steele, Deputy

Ordinance No. 8405 (New Series)
No. 48
5/17/94
mcs

This is a true certified copy of the original document on file or of record in my office. It bears the seal of the County of San Diego and signature of the Clerk of the Board of Supervisors, imprinted in purple ink.

*Thomas J. Pastuszka*
Clerk of the Board, San Diego County, California

Date: 10-18-95 By Deputy: _____

00211