[No. B174674. Second Dist., Div. Eight. Mar. 30, 2006.]

TRANCAS PROPERTY OWNERS ASSOCIATION, Plaintiff and Appellant,
v.
CITY OF MALIBU, Defendant and Respondent;
TRANCAS-PCH, LLC, Real Party in Interest and Respondent.

COUNSEL

Jeffer, Mangels, Butler & Marmaro, John M. Bowman and David R. Daniels for Plaintiff and Appellant.

Jenkins & Hogin, Christi Hogin and Gregg Kovacevich for Defendant and Respondent.

Horvitz & Levy, Barry R. Levy, Andrea M. Gauthier; Law Offices of Alan Robert Block, Alan Robert Block and Michael N. Friedman for Real Party in Interest and Respondent.

Dennis J. Herrera, City Attorney, and Paul Zarefsky, Deputy City Attorney, for California League of Cities as Amicus Curiae.

OPINION

**COOPER, P. J.**—Involved in litigation with developer Trancas-PCH, LLC (Trancas), over the validity of Trancas's final subdivision maps, which it had disapproved, the City of Malibu (city) entered into a written agreement with Trancas to rescind the disapproval, eventually to approve one of the maps, and to exempt a downsized Trancas development from certain present or prospective zoning restrictions. In exchange, Trancas agreed to dedicate three-fourths of its acreage to the city, and to dismiss the pending lawsuit. The city council approved the agreement in a closed session.

We hold that the agreement, however well-intended, was invalid, because it impermissibly attempted to abrogate the city's zoning authority and provisions. Addressing a further issue that could well recur, we also hold that adoption of the agreement in a closed council session violated the Ralph M. Brown Act, Government Code section 54950 et seq. (Brown Act), even though the agreement included a settlement of litigation.[1] For both reasons, we reverse the judgment denying the petition of appellant Trancas Property Owners Association (Association) for a writ of mandate to set aside the agreement.

## FACTS

Trancas owns approximately 35 acres of undeveloped land in the city (property), situated upland of Pacific Coast Highway, near its intersection with Trancas Canyon Road. South of the highway lie Trancas Beach and

---

[1] Undesignated section references hereafter are to the Government Code.

Broad Beach, adjacent to which the Association's roughly 90 members own homes. Trancas acquired the property in 1998 from a previous owner-developer, Trancas Town, Ltd., which was in bankruptcy. Trancas having succeeded to Trancas Town's rights and obligations, for simplicity we refer to both owners as Trancas.

Efforts to subdivide the property extend back over 20 years. Before the city's incorporation in 1991, its territory, including the property, was an unincorporated portion of the County of Los Angeles (county). In 1985, the county approved two tentative subdivision (or tract) maps for the property, which indicated a proposed subdivision of 15 single-family lots on an approximately 26.5-acre tract, and 52 condominium town houses on the remaining 8.5-acre tract. The tentative maps were approved subject to various conditions, which, under the Subdivision Map Act, section 66410 et seq. (Map Act), had to be satisfied before Trancas could obtain approval of final tract maps, and thus be authorized to subdivide. (§§ 66426, 66458, subd. (a); see *Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501, 509 [191 Cal.Rptr. 140] [construing § 66473].)

In 1993, Trancas submitted proposed final subdivision maps for consideration and approval to the city, which now had jurisdiction over the property. The city, however, refused to consider them, asserting that the preliminary maps had temporally expired. In this regard, a tentative map generally expires two years after its approval or conditional approval (§ 66452.6, subd. (a)), subject to extensions by the governing body (*id.*, subd. (e)), and to tolling during a development moratorium (*id.*, subds. (b), (f)). Such expiration terminates all proceedings under the Map Act, and precludes filing of a final map until a new tentative map is processed. (*Id.*, subd. (d).)

Trancas petitioned the superior court for a writ of mandate, which the court granted, finding the city's position not well taken. In May 1995, Division Two of this court affirmed that judgment, ruling that a combination of an extension by the county and tolling because of development moratoria (including one imposed by the city at its creation) had preserved the tentative maps' vitality to September 1993.

Although Trancas thus retained the ability to file its final maps, their approval by the city remained forestalled by a number of factors, including questions regarding the status of other governmental approvals, on which the tentative maps had been conditioned. One of these was a coastal development

permit, which Trancas had obtained from the California Coastal Commission. The question arose whether that permit had expired, under the commission's regulations, because Trancas had failed timely to commence development.

The Coastal Commission's general counsel informally opined that the permit would be considered subsisting if Trancas obtained final subdivision map approval. Plaintiff Association then brought suit for a declaration that the coastal permit had expired. The trial court ruled against the Association, but the Second District Court of Appeal, Division Six, reversed. In an unpublished decision rendered December 18, 2001, the court rejected the commission's counsel's views as nonauthoritative, and stated that city approval of the final maps could not be granted so long as regulatory conditions of the tentative maps remained unfulfilled.[2]

The city resisted further processing Trancas's final maps, because of claimed failures to satisfy tentative map conditions. Taking issue with these contentions, in 2002 Trancas sued the city, to enjoin it from disapproving the maps. After unsuccessful settlement efforts, the action was reinitiated in January 2003, but Trancas's requests for temporary restraining order and preliminary injunction were denied, leaving the city free to act pending trial.

On March 24, 2003, the city council unanimously adopted resolution No. 03-15 (the resolution), disapproving Trancas's applications for approval of its final maps. The resolution cited both section 66473 and section 16.16.060 of the Malibu Municipal Code (Municipal Code), as requiring the city to disapprove a final subdivision map if the applicant did not satisfy conditions that were applicable when the tentative map was approved. The council found that numerous conditions of the tentative maps had not been satisfied, including requirements for a coastal development permit and for approval by the Regional Water Quality Control Board of the project's proposed septic wastewater disposal system. The resolution characterized each of these shortcomings, and the overall failure to satisfy conditions, as a sufficient and independent basis for disapproving the final maps. Finally, the resolution alternatively found and ordered that, owing to the expiration of Trancas's tentative maps in 1993 or at the latest 1996, all proceedings on the subdivision maps were terminated, under section 66452.6, subdivision (d).

---

[2] The court so stated while applying the holding of Division One of this court, in a case involving another project, that a coastal permit had not expired because the city engineer had already approved that project's final subdivision map. (*Trancas Property Owners Assn. v. City of Malibu* (1998) 61 Cal.App.4th 1058 [72 Cal.Rptr.2d 131].)

Trancas subsequently delivered an application for a new coastal permit to the Coastal Commission, but the commission replied that in light of a recently approved local coastal plan, Trancas now had to present the application to the city. The city, in turn, generally declined to process such applications, pending resolution of its own lawsuit challenging the coastal plan—which was not concluded until after the judgment in this case. (*City of Malibu v. California Coastal Com.* (2004) 121 Cal.App.4th 989 [18 Cal.Rptr.3d 40].)

Contemporaneous with the resolution, representatives of the city and Trancas recommenced discussions to explore settling both Trancas's pending lawsuit and the overall subdivision matter. On April 14, 2003, before its regular meeting, the city council met in closed session to discuss numerous lawsuits, of which Trancas's was the last one listed on the agenda.[3] That evening, apparently following this session, the city's mayor and a representative of Trancas executed a short "Deal Memo," handwritten by the city attorney and "Accepted" by Trancas.

The two-page document recited that the parties agreed to settle "the disputes between them related to" the property, including the pending lawsuit, "as well as all other potential disputes over the development of the property," on the following terms: (1) Trancas would dedicate to the city the larger of the property's two tracts, approximately 26.5 acres. (2) The city "shall approve amended or revised final map No. 29273 to permit up to 32 units" on the roughly 8.5-acre tract, on which 52 town houses were originally to be built. (3) Four of the new units would be restricted for sale to low- or moderate-income families. (See, e.g., Health & Saf. Code, § 50093.) (4) "The units shall be built in conformance with development standards of City's zoning code, except density."

On April 28, 2003, the city council again met in closed session, to discuss the terms of the settlement. The matter was considered further in a closed session of April 30. There the council approved and the city entered into a 10-page "Settlement Agreement" (SA). The city attorney announced the SA and summarized its terms at a public council session that followed.[4]

The SA included the following salient elements. Paragraph 1 provided: "The City shall rescind Resolution No. 03-15 [disapproving the final maps], as it pertains to Tract No. 29273, and said resolution shall be null and void as to said tract." Under paragraph 2.1, Trancas would record a covenant, limiting development on that smaller tract to 32 units, four of them restricted to low-to-moderate-income housing, and each to include 2,000 to 2,400 square feet, and be not more than 28 feet high. "Any changes to the development as a result of th[is] covenant . . . shall conform to the City's zoning code in effect as of the date of the recordation of said covenant, except any limitations on density which vary from the terms of the covenant." With further regard to zoning, by paragraph 3.2 the city agreed not to enact

---

[3] The city has requested that we take judicial notice of this agenda. We do so, but only as proof of its contents. We also grant the city's concurrent request for judicial notice of a portion of the Municipal Code.

[4] The city attorney had informed the Association's attorney of the initial agreement of April 14, 2003, and counsel had responded, by letters to the city attorney and later the city council, with objections to the proposed settlement, on both procedural and substantive grounds.

"zoning or other ordinances applicable to the property that prohibit the construction of the residential units depicted in the final map, as limited by the terms of the covenant . . . ."

The SA further provided that "If necessary, the City shall further expedite the processing of a general plan amendment" for the property. Trancas would diligently satisfy all remaining conditions of the tentative map for the smaller tract. Once Trancas had done so, and had recorded the covenant, the city engineer would certify the final map, and the city council would approve it. If, however, another agency or a court required that a revised tentative map be filed, because of the covenant's alteration of the development, Trancas would speedily present such a map, in lieu of the contemplated final map.

Finally, with its final map Trancas would offer to dedicate the larger tract to the city, for public recreation and open space, reserving an easement for discharge of treated water from the smaller tract's wastewater disposal system. Following recording of the final map and the covenant, Trancas would dismiss with prejudice its pending lawsuit against the city. The agreement would not be severable.

In sum, by the SA the city would obtain dedication of three-fourths of Trancas's property, a scaled-down development project, and relief from Trancas's lawsuit concerning the validity of final subdivision maps for a more extensive development. Trancas would obtain reinstatement of its final map application, which would be approved once the conditions of the tentative map were met. In addition, the city extended guarantees that Trancas's proposed development would not be blocked by future zoning, or be required to comply with zoning density restrictions of whatever age. As a further benefit, the city would if necessary expedite amending its general plan with respect to the development.

In June 2003, the Association commenced the present case, filing a petition for writ of mandate and complaint for declaratory relief against the city, with Trancas named as real party in interest. The ultimate, amended version of the pleading contained four causes of action. The first sought a writ of mandate (Code Civ. Proc., § 1085), requiring the city to set aside its approval of the SA, on grounds that (a) the city's resolution disapproving the final subdivision maps was correct and in any event final, (b) the revised development project did not conform with the prior tentative map, (c) approval of the SA had required but had not received review under the California

Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA), and (d) adoption of the SA in a closed session of the city council violated the Brown Act. The petition's third cause of action restated and enlarged the Brown Act challenge.

The Association's second cause of action sought a writ of mandate requiring the city to disapprove the final maps, because the tentative maps had expired, and because Trancas had not met numerous conditions imposed with them. In a fourth cause, for declaratory relief, the Association sought a declaration sustaining several of its previously alleged contentions.

The trial court denied all of the writ relief requested. The court opined that the SA did not violate any provision of the Map Act or the Municipal Code, nor did it constitute approval of a discretionary project within the meaning of CEQA. As for the Brown Act, the city council had been entitled to consider the SA in closed session, under the litigation exception of section 54956.9. The Association was not entitled to a writ on the second cause of action, challenging the final maps, because "The court can find no provision of either the Subdivision Map Act or of the Malibu Municipal Code that imposes upon the City a mandatory duty to disapprove a final tract map." (But see §§ 66458, subd. (a), 66473; Mun. Code, § 16.16.060.)

The superior court also disallowed most of the declaratory relief requested. However, the court did declare, based on the Municipal Code, that unless Trancas recorded a final map for the modified project that conformed to the original tentative tract map, that code would prohibit transfer of title to any of the subdivision, until such a complying final map was recorded.

The Association appealed from the judgment as a whole.

## DISCUSSION

The parties' contentions pose a number of legal issues, involving the Map Act, the Brown Act, CEQA, and other principles of local government and land use law. However, we need not resolve all of these questions, because two are independently dispositive of the appeal. First, the SA is intrinsically invalid because it includes commitments to take or refrain from regulatory actions regarding the zoning of Trancas's development project, which may

not lawfully be undertaken by contract. Second, the SA is also invalid as a municipal act because its adoption in closed city council session violated the Brown Act. Because of this invalidity, the Association's further contentions under CEQA and the Map Act are moot.

### 1. *Retraction of Zoning Authority.*

█ In paragraph 3.2 of the SA, the city agreed that it would not enact "zoning or other ordinances applicable to the property that prohibit the construction of the residential units depicted in the final map, as limited by the terms of the covenant . . . ." This promise to abjure legislative zoning action was unlawful. A similar situation came before the Supreme Court in *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*). There, a developer had agreed to sell and dedicate acreage to a local harbor district, conditioned on the issuance of certain development approvals for a project. (*Id.* at p. 799.) The developer asserted that this agreement precluded enforcement of a coastal permit requirement. █ The Supreme Court held that, assuming the contract "constituted a promise by the government that zoning laws thereafter enacted would not be applicable to [the tract], the agreement would be invalid and unenforceable as contrary to public policy." (*Id.* at p. 800.) The court explained, "Land use regulations, such as the [then coastal act], involve the exercise of the state's police power [citation], and it is settled that the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Ibid.*; accord, *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 [225 Cal.Rptr. 43]; see *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 723 [77 Cal.Rptr.2d 1].)

A second, similar attempt to restrict the city's zoning appears in paragraph 2.1 of the SA. It provides that the revised project will conform to the city's zoning code as of the recording of Trancas's development covenant, "except any limitations on density which vary from the terms of the covenant." Although the parties suggest that the quoted exception is ambiguous, it rather plainly constitutes agreement that the development need not comply with density limitations different from the density set forth in the covenant. The language thus follows the Deal Memo's statement that "The units shall be built in conformance with development standards of City's zoning code, except density." The provision most likely was occasioned by the fact that the existing zoning of the property allows only one residence per five acres, far fewer than the number the SA contemplates.

■ This contractual exemption from an element of the city's zoning is indistinguishable from the one condemned by *Avco, supra,* 17 Cal.3d at page 800. Moreover, it functionally resembles a variance. Such departures from standard zoning, however, by law require administrative proceedings, including public hearings (§ 65905; Mun. Code, ch. 17.72; *id.,* § 17.72.040), followed by findings for which the instant density exemption might not qualify. (See § 65906; Mun. Code, § 17.72.060.) Both the substantive qualifications and the procedural means for a variance discharge public interests. Circumvention of them by contract is impermissible.

■ As the Association points out, there exist procedures by which a landowner-developer and a city or county may lawfully agree to permit a described development project, including fixing the zoning governing it. (§ 65864 et seq.; see *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 226–227 [100 Cal.Rptr.2d 740] *(Santa Margarita).*) Under the governing statute, however, numerous procedural and substantive limitations attend the making and performance of such a "development agreement."[5] In *Santa Margarita,* an agreement made pursuant to and in conformity with this regime surmounted a challenge that it worked an unconstitutional surrender of the police power. *(Id.* at pp. 232–233.) The provisions of the SA which we have discussed cannot do so.

Defending these provisions, the city and Trancas do not come to grips with their significance. Trancas essentially avers that the city did no more than settle a dispute with it, obtaining consideration in exchange for "agreeing not to enact ordinances that would interfere with the proposed development . . . ." Of course, that is what *Avco, supra,* 17 Cal.3d at page 800, declared to be prohibited. Trancas also argues that paragraph 2.1's exemption from compliance with density restrictions cannot yet be termed a variance, because those restrictions may be relaxed by the time Trancas is ready to build. But whatever the density requirements may turn out to be, the SA presently provides Trancas a red carpet around them. The city similarly asserts that the challenged provisions are not ripe for writ review, because the development they frame will not immediately or even necessarily take place. The city,

---

[5] "Particulars of the statute include requirements that a development agreement may be approved only after a public hearing (§ 65867) and must be consistent with the general plan and any specific plan (§ 65867.5), a provision permitting annual review by the governmental entity and termination for noncompliance (§ 65865.1), and a statement that the agreement is subject to referendum (§ 65867.5). The statute also specifies certain provisions which may or must be included in a development agreement. (§ 65865.2.)" *(Santa Margarita, supra,* 84 Cal.App.4th at p. 227.)

however, has already made impermissible promises and commitments which, contrary to its argument, extend beyond simply renewed consideration of the final maps. Regardless of the city's and Trancas's assurances that zoning and general plan changes lie in the future, the SA's covenants to restrict zoning for Trancas's project constitute present, absolute commitments, adjudication of which is timely and appropriate. (Cf. *Green v. Obledo* (1981) 29 Cal.3d 126, 144–145 [172 Cal.Rptr. 206, 624 P.2d 256]; *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22–24, 26 [61 Cal.Rptr. 618].)

The Association urges that other aspects of the SA also impermissibly conflict with and evade zoning law—principally paragraph 2.1's provision for applying the city's zoning code (other than density limits) as it exists when Trancas records the development covenant, rather than when Trancas obtains a building permit. We need not, however, resolve these issues, or for that matter the first cause of action's further claim that adoption of the SA required an evaluation under CEQA. The SA specifically provides that its provisions are not severable, and the unlawful provisions already considered render the agreement invalid. The Association is entitled to a writ of mandate setting it aside.

The Association's second cause of action sought a writ requiring the city to disapprove the final maps because of certain alleged shortcomings. The Association's challenges to the maps are not now suitable for adjudication, because they are moot. The city already has disapproved Trancas's maps, by the resolution, and for essentially the reasons the Association advances. Although the SA called for rescission of the resolution, the city avows that that has not occurred, and the SA now has been determined invalid. We do not at this juncture find it appropriate to render an advisory opinion, regarding the intrinsic merits of maps that have been rejected.[6]

2. *The Brown Act.*

In its third cause of action, the Association adduced a separate challenge to the SA, as invalid because adopted in closed city council session, allegedly in violation of the Brown Act. (See § 54960.1, subd. (a) [authorizing mandate proceeding to determine that action taken in violation of certain provisions of the act is "null and void"].) The trial court rejected this challenge, on the ground that the city council's consideration and approval of the agreement were exempt from the public meeting requirements of the act (§§ 54952.6, 54953, subd. (a)) by virtue of section 54956.9's exception for consultation

---

[6] Nor does the Association's fourth cause of action, for declaratory relief, require appellate adjudication. The six pleaded issues largely replicate the claims of the second cause. Moreover, the Association has not separately pressed them here.

with counsel regarding pending litigation.[7] Respondents presently defend that holding, while the Association opposes it. Whether or not the exemption for advice about pending litigation authorizes approval in closed session of a settlement agreement containing the dynamic features of the SA is a novel question, potentially subject to recurrence. We therefore address it, even though we already have held the SA invalid for other reasons.[8]

The city avows that it "technically complied" with the Brown Act in adopting the SA. The nature of the city's compliance was as follows: Three weeks after disapproving Trancas's final maps, the city council met, on April 14, 2003, first in closed and then in open session. The closed-session agenda listed, by name, court, and case number, about 30 lawsuits to be discussed; Trancas's case was listed last, on page 3 of the agenda. This listing, done in accordance with section 54954.5, subdivision (c), constituted the full extent of public notice of the council's discussions about the lawsuit and the incipient settlement. Following the closed session, the city attorney presented to Trancas the Deal Memo, containing the essentials of what would become the SA. Trancas's lawsuit was listed again, in the same manner and location, on the agenda for the council's April 28, 2003 closed session. At that meeting, the closed-session agenda items were continued to April 30, 2003, at which time the council, in a further closed meeting, adopted the SA. (Under section 54954.2, subdivision (b)(3), further notice by way of agenda for the April 30 meeting was not required.) The city attorney then announced the SA and its terms at the public hearing that followed.

■ Did the litigation exemption of section 54956.9 permit the city to approve the SA in closed session, and with the abbreviated agenda notice permitted for such sessions? The Association acknowledges that section 54956.9 does authorize a city council to discuss with its counsel, in closed session, settlement of a lawsuit to which the city is a party. (See *id.*, subd. (a).) That entitlement is not in question here. Distinctly, although the section does not expressly so provide, it has been construed, generally, also to permit a local legislative body to approve such a settlement in closed session. (See *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 798–799 [3 Cal.Rptr.3d 703, 74 P.3d 795] [discussing 75 Ops.Cal.Atty.Gen. 14 (1992),

---

[7] Section 54956.9 relevantly provides: "Nothing in this chapter shall be construed to prevent a legislative body of a local agency, based on advice of its legal counsel, from holding a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation."

[8] Following our original decision of this case, we granted rehearing to permit further consideration of this question.

which so opined]; cf. *id.* at pp. 800–801 [open meeting law for state agencies]; § 54957.1, subd. (a)(3) [reporting of "Approval given to [legislative body's] legal counsel of a settlement of pending litigation . . ."].) Nevertheless, the Association urges, this exemption from the requirement that action be taken in public, after an opportunity for public comment (§§ 54953, subd. (a), 54954.3), cannot apply to the adoption of a settlement agreement like the SA, that includes either provisions for action that would ordinarily be subject to the Brown Act's open meeting requirements (e.g., rescission of the final map disapproval), or decisions intrinsically required by law to be made after public hearings (e.g., grant of a zoning variance).[9]

■ In support of its position, the Association cites *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904 [117 Cal.Rptr.2d 631] (*Shapiro*). That case stands first for the proposition that statutory exceptions to the Brown Act's general requirements of local legislative openness are to be narrowly construed, having in mind the general spirit of the act (see § 54950).[10] (*Shapiro,* at p. 917.) Substantively, the decision addressed, among other things, the nature and scope of discussion allowed in city council closed session by section 54956.8, which permits such sessions held with a real property negotiator, regarding the terms of purchase, sale, exchange, or lease of property. In the context of a major and complex redevelopment project to build a new baseball stadium, the court rejected San Diego's arguments that these closed sessions should be permitted to extend, beyond the specific matter in the statute, to significantly related items, such as finance, environmental impact, and architectural design. The court declared that "The important policy considerations of the Brown Act . . . must be enforced, even where particular transactions do not fit neatly within its statutory categories." (*Shapiro,* at p. 924.)

The city and Trancas insist that the closed-session provision construed in *Shapiro* is distinctly narrow, whereas both the text of section 54956.9 and the authorities construing it embrace a broader, more general exemption for

---

[9] The Association also argues that the SA violated the Brown Act because the settlement was actually decided on when the city tendered the Deal Memo, two weeks earlier. But indulging this premise arguendo, presentation of the Deal Memo to Trancas also followed a nominally properly noticed closed session, to discuss the ongoing litigation. The Association's instant argument thus depends on the answer to the principal issue.

[10] This initial section of the Brown Act provides: "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. [¶] The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (§ 54950.)

litigation settlement agreements. As Trancas puts it, "The Brown Act permits cities to settle litigation in closed session; it makes no exception for settlements 'concerning' matters ordinarily dealt with in open session or settlements 'addressing' matters that ordinarily require a public hearing." But this argument simply begs the issue presented.

■ Again, section 54956.9 does not by its terms provide for entry into or approval of settlements in closed session, at all. (See *ante*, fn. 7.) Rather, the statute has been construed to allow a city council to do so. (E.g., 75 Ops.Cal.Atty.Gen. 14, *supra*; but see *Southern California Edison Co. v. Peevey, supra,* 31 Cal.4th at pp. 813–814 (conc. & dis. opn. of Baxter, J.).) But this implied exemption is subject to narrow construction. (*Shapiro, supra,* 96 Cal.App.4th at p. 917; accord, *Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 185 [35 Cal.Rptr.3d 826].) And as "emphasized" in the Attorney General's manual on the Brown Act, "the purpose of [section 54956.9] is to permit the body to receive legal advice and make litigation decisions only; it is not to be used as a subterfuge to reach nonlitigation oriented policy decisions." (Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p. 40.)

Section 54956.9's implied allowance for adoption of settlements in closed session thus may be subject to limits. And whatever else it may permit, the exemption cannot be construed to empower a city council to take or agree to take, as part of a non-publicly-ratified litigation settlement, action that by substantive law may not be taken without a public hearing and an opportunity for the public to be heard. As a matter of legislative intention and policy, a statute that is part of a law enacted to assure public decisionmaking, except in narrow circumstances, may not be read to authorize circumvention and indeed violation of other laws requiring that decisions be preceded by public hearings, simply because the means and object of the violation are settlement of a lawsuit. Under this vital construction of section 54956.9, the city council's closed-session adoption of the SA, thereby in essence granting Trancas a zoning variance for its 32-unit project, was not authorized by the section, and hence violated the Brown Act's open meeting requirements.

The city and amicus curiae assert that such a construction of section 54956.9 and the Brown Act needlessly and improperly mingles and confuses the protections of the latter with those of extrinsic laws requiring public hearings. In this view, a settlement that violated provisions for zoning hearings would be invalid under those provisions, but would not violate the Brown Act. But as we see it, the Brown Act violation arises independently, when the settlement is made in closed session, but is not within the section 54956.9 exception because it violates the extrinsic hearing provisions.

The city also states that, in its view and perhaps its normal practice, "any settlement agreement involving a permit or approval requiring a public hearing must provide that the public hearing will be held." The city explains that in its "typical settlement" involving such a situation, the litigation is tolled pending the hearing, after which the either the settlement is effective or the litigation is resumed. This is a salutary model, and its pursuit should avoid a Brown Act violation. But it is not what the SA provided.

Our conclusion that the Brown Act's implied exception for adoption of litigation settlements in closed session does not embrace such agreements as provide for governmental decisions without legally required public hearings should not burden local governments. The statutory exemption of discussions with counsel remains plenary: under section 54956.9, governing bodies may discuss with their counsel, in closed session, any settlement proposals or terms they deem worthy of consideration. And they generally may agree to such terms and settlements in closed session. What they may not do is decide upon or adopt in closed session a settlement that accomplishes or provides for action for which a public hearing is required by law, without such a hearing. Because the SA's nonseverable zoning exemption in paragraph 2.1 so provided, adoption of the SA violated the Brown Act.

### 3. Conclusion.

Our conclusion that the SA is invalid as presently cast should not be taken as disparaging either the values favoring settlement of disputes or, in this case particularly, the public benefit that the city sought to reap through dedication of the larger Trancas tract. Agreements that satisfy the needs and interests of developers, concerned citizens, and the municipality that embraces their interests and those of the broader public, should be pursued and commended (cf. §§ 65864 et seq., 66030 et seq.)—and such a result should yet be possible here. The limit that we necessarily recognize and enforce is that statutory procedures and protections of public involvement cannot be ignored, and established regulatory regimes such as zoning may not be deviated from solely on bilateral agreement.

## DISPOSITION

The judgment is reversed. The trial court shall enter judgment granting a writ of mandate requiring the city to set aside the Settlement Agreement adopted April 30, 2003. Appellant Association shall recover its costs on appeal from respondents jointly and severally.

Boland, J., and Flier, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied June 21, 2006, S143211.