Filed 6/12/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| COUNTY OF VENTURA et al.,<br><br>  Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF MOORPARK,<br><br>  Defendant and Appellant;<br><br>BROAD BEACH GEOLOGIC HAZARD ABATEMENT DISTRICT,<br><br>  Defendant and Respondent. | 2d Civil No. B282466<br>(Super. Ct. No.<br>VENCI00479937)<br>(Santa Barbara County) |

The purpose of the California Environmental Quality Act (CEQA) is to ensure "[t]he maintenance of a quality environment for the people of this state now and in the future." (Pub. Resources Code,[1] § 21000, subd. (a).) But the scope of CEQA is not unlimited. (*Sunset Sky Ranch Pilots Assn. v. County*

---

[1] All further unlabeled statutory references are to the Public Resources Code.

*of Sacramento* (2009) 47 Cal.4th 902, 907 (*Sunset Sky*).) CEQA applies only to activities that meet the definition of a "project" under the statute. (*Ibid.*) And certain projects are statutorily exempt from environmental review. (*Ibid.*) Thus, "[a]lthough we construe CEQA broadly '"to afford the fullest possible protection to the environment within the reasonable scope of the statutory language,"' we do not balance the policies served by the statutory exemptions against the goal of environmental protection." (*Ibid.*)

This case requires us to consider whether the broad definition of "project" that mandates more extensive CEQA review also applies to statutory exemptions. It additionally presents questions of state law preemption, the limits of a city's contractual authority, and the abdication of a government entity's police power.

The County of Ventura and City of Fillmore (collectively, Appellants) appeal from the judgment denying their petition for writ of mandate and request for injunctive relief, and denying, in part, their request for declaratory relief. Appellants contend the trial court erred when it determined that a beach restoration project undertaken by Broad Beach Geologic Hazard Abatement District (BBGHAD) is exempt from CEQA review. They also contend a settlement agreement between BBGHAD and the City of Moorpark (collectively, Respondents) that was incorporated into the project: (1) is preempted by state law, (2) constitutes an illegal attempt by Moorpark to regulate traffic outside city limits, and (3) represents an abdication of BBGHAD's police power. In its cross-appeal, Moorpark challenges the court's finding that portions of the agreement are void.

We conclude that the beach restoration project, including its incorporation of Respondents' settlement

2

agreement, is a single "project" that is statutorily exempt from CEQA review. The traffic restrictions in the agreement are not preempted by state law, nor do they constitute extraterritorial regulations. Instead, they represent a valid exercise of Moorpark's contracting authority. But because BBGHAD abdicated its police power in portions of the agreement, we conclude those provisions are void or subject to future modification. We reverse the judgment in part, affirm in part, and remand.

FACTUAL AND PROCEDURAL HISTORY

The state formed BBGHAD to restore a 46-acre stretch of Broad Beach in the City of Malibu. The beach restoration project requires 300,000 cubic yards of sand initially, with four subsequent deposits of equal size to be made at five-year intervals. Periodic supplemental deposits of up to 75,000 cubic yards each may be made on an as-needed basis. The project will continue no more than 20 years, unless BBGHAD and applicable permitting agencies approve an extension.

Each of the five major deposits will generate 44,000 one-way truck trips over the course of three to five months. BBGHAD will obtain sand for the project primarily from the Grimes Rock and CEMEX quarries, both located adjacent to State Highway 23 between Fillmore and Moorpark. It may also obtain a limited amount of sand from the P.W. Gillibrand quarry.

During the project approval process, Moorpark officials expressed concern that hauling sand through or adjacent to their city would negatively impact residents. Respondents held discussions to address Moorpark's concerns, which culminated in a settlement agreement. Provisions of the agreement relevant to this appeal include:

3

Section 2: "Trucks used for sand hauling in connection with the Project are prohibited from using Walnut Canyon Road, Grimes Canyon Road south of Broadway Road[,] or any other highway, road[,] or street in or immediately adjacent to the City of Moorpark, except in cases of 'emergency,' as defined in Section 5."

Section 3: "All trucks used for sand hauling in connection with the Project shall not be staged or parked in [Moorpark] or immediately adjacent to [Moorpark], at anytime [*sic*] for the duration of the Project."

Section 4: "All sand hauling trucks for the Project shall use Grimes Canyon Road (State Route 23) to State Highway 126 through Fillmore as the haul route from the Grimes Rock quarry and/or the CEMEX quarry to the Project site[,] and the same route from the Project site to the [quarries]."

Section 5: "An 'emergency' exists, for purposes of Sections 2 and 6, only when a first responder . . . determines all lanes on State Highway 126 west of State Highway 23 or State Highway 23 north of the quarry are closed to truck traffic. An emergency ceases to exist when a first responder determines that at least one lane becomes available to truck traffic on [the] portions of State Highway 126 and State Highway 23 referenced above."

Section 7: "The haul route prohibitions shall apply to the BBGHAD's use of the Grimes Rock Quarry and CEMEX Quarry throughout the duration of the Project. The BBGHAD shall provide [Moorpark] notice of the commencement and completion of each of the sand deposition events for the Project."

4

Section 8:  "The BBGHAD shall include the haul route prohibitions in any agreements entered into between [it], the quarries, and any contracted haulers[,] and require[] contracted haulers to include such terms in their agreements with their subcontracted haulers involved in the Project . . . ."

Section 26:  "This Agreement may be amended or modified only by the mutual agreement of the Parties and only when all Parties memorialize in writing their consent to amend or modify."

The Coastal Commission approved a coastal development permit for the beach restoration project, including its incorporation of Respondents' settlement agreement, in October 2015.  The State Lands Commission approved a lease for the project the following year.

Appellants challenged the project in a petition for writ of mandate and request for injunctive and declaratory relief. The trial court found the project statutorily exempt from CEQA. It also determined that the settlement agreement is neither preempted by the Vehicle Code nor an improper attempt by Moorpark to regulate traffic outside city limits.  But the court did find that BBGHAD improperly contracted away to Moorpark its police power in portions of the agreement.  It declared void the first sentence of section 7, declared void all of section 26 to the extent it prohibits BBGHAD from modifying haul routes in response to changed circumstances, and found section 8 subject to modification should hauling routes change in the future.

DISCUSSION

*CEQA*

Appellants contend the settlement agreement is distinct from BBGHAD's beach restoration activities, and is thus a separate, nonexempt CEQA project.  We disagree.

CEQA establishes a three-tier process to ensure that public agencies inform their decisions with environmental considerations.  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379-380 (*Muzzy Ranch*).)  An agency must first determine whether an activity is a "project" for purposes of CEQA.  (*Id.* at p. 380.)  If it is, the agency determines whether an exemption applies.  (*Ibid.*)  If the project is exempt, no further environmental review is required.  (*Ibid.*)  If the project is not exempt and may cause significant environmental effects, however, the agency must prepare an environmental impact report (EIR).  (*Id.* at p. 381.)

CEQA "projects" include activities undertaken by public agencies that cause direct physical changes to the environment.  (§ 21065.)  What constitutes a project is given a broad interpretation.  (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1203 (*RiverWatch*).)  A project refers to "the whole of an action" (Cal. Code Regs., tit. 14, § 15378, subd. (a)), not each individual component (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698).  Thus, where two activities are "part of a coordinated endeavor" (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1228 (*Tuolumne CCRG*)), "among the 'various steps which taken together obtain an objective'" (*id.* at p. 1226), or otherwise "related to each other" (*Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42

6

Cal.App.3d 712, 726), they constitute a single project for purposes of CEQA. It is only "where the second activity is independent of, and not a contemplated future part of, the first activity, [that] the two activities may be reviewed separately." (*Sierra Club*, at p. 699.) Whether two activities are parts of a single project is a question for our independent review. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382.)

The settlement agreement between Moorpark and BBGHAD is part of the whole of the action of the beach restoration project. The state formed BBGHAD to address beach and sand dune erosion at Broad Beach. (See § 26525 [purposes of a geologic hazard abatement district].) BBGHAD's mandate is to make "improvements" to the beach that address "geologic hazards," including beach and dune erosion. (See § 26580 [improvements a district may undertake].) These improvements require depositing more than 1.5 million cubic yards of sand at the beach over a 20-year period. The agreement that requires haulers to drive their payloads north from the quarries, through Fillmore, and west to Broad Beach is incidental to BBGHAD's beach restoration activities, and therefore also qualifies as an improvement undertaken by BBGHAD. (§ 26505 ["improvement" includes all activities "necessary or incidental to" abating "a geologic hazard"]; see also § 26574, subd. (d) [authorizing BBGHAD to "[e]xercise all powers necessary or incidental to carry out" the restoration project].) It is one piece of a single, coordinated endeavor to address erosion at Broad Beach, and is thus part of the whole of the action. (*RiverWatch*, *supra*, 170 Cal.App.4th at p. 1204.)

Applying the definition of "separate projects" set forth in *Banning Ranch Conservancy v. City of Newport Beach*

7

(2012) 211 Cal.App.4th 1209 does not change our conclusion. *Banning Ranch* defined "separate projects" as those that "have different proponents, serve different purposes, or can be implemented independently." (*Id*. at pp. 1223-1224.) But under this definition, the beach restoration and settlement agreement are parts of a single project.

First, both Respondents are proponents of the settlement agreement: Moorpark avoids negative impacts from trucks hauling sand through the city, while BBGHAD is released from any claims related to the project. Second, the agreement and restoration activities serve a single purpose: to abate a geologic hazard. Third, even if the beach restoration could be completed without the agreement, the two became inextricably linked when the agreement was incorporated into the coastal development permit. "At that point in time, the independent existence of the two actions ceased for purposes of CEQA and the [agreement] became 'a contemplated future part of' completing the [restoration project]." (*Tuolumne CCRG*, *supra*, 155 Cal.App.4th at pp. 1230-1231.) The agreement is not a separate project under *Banning Ranch*.

It is also exempt from CEQA. (Cf. *Defend Our Waterfront v. State Lands Com.* (2015) 240 Cal.App.4th 570, 587 [scope of a statutory exemption reviewed de novo].) The settlement agreement is an "improvement" under section 26505. Improvements undertaken by a geologic hazard abatement district are "specific actions necessary to prevent or mitigate an emergency." (§ 26601.) By statutory exemption, CEQA does not apply to these actions. (§ 21080, subd. (b)(4).)

Appellants contend this is an absurd result since "the Legislature intended [CEQA] to be interpreted in such manner as

8

to afford the fullest possible protection to the environment . . . ." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259, disapproved of on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896-897.)  But as our Supreme Court has explained, it is not "necessarily correct . . . to assume that a harmony . . . exist[s] between CEQA's general purpose and the purposes of each of its statutory exemptions." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 381, superseded by statute on another ground as stated in § 21080.04, subd. (b).)  "The exemptions reflect a variety of policy goals" that "promote[] an interest important enough to justify forgoing the benefits of environmental review." (*Id.* at pp. 381-382.)  Courts thus "do not balance the policies served by the statutory exemptions against the goal of environmental protection." (*Sunset Sky*, *supra*, 47 Cal.4th at p. 907.)  "'[T]he self-evident purpose of the [emergency] exemption is to provide an escape from the EIR requirement despite a project's clear, significant impact.' [Citation.]" (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 506.)

We therefore find no absurdity in holding that the broad definition of "project" employed in cases that have mandated expanded environmental review also applies in cases where, as here, using that definition will result in the broader operation of a statutory exemption.  The entirety of BBGHAD's beach restoration project, including its settlement agreement with Moorpark, is exempt from CEQA.

*Preemption*

Appellants next contend the settlement agreement is void because Vehicle Code section 21 preempts Moorpark's ability to control project traffic.  We again disagree.

9

A city may enact and enforce, within its limits, only those ordinances and regulations that do not conflict with state law. (Cal. Const., art. XI, § 7.) If a local ordinance or resolution conflicts with state law, it is void. (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897.) A conflict exists if an ordinance or resolution ""'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.'" [Citations.]" (*Ibid.*)

State law preempts local traffic control ordinances and resolutions. Vehicle Code section 21, subdivision (a) provides: "[A] local authority shall not enact or enforce any ordinance or resolution on the matters covered by this code, including ordinances or resolutions that establish regulations or procedures for, or assess a fine, penalty, assessment, or fee for a violation of, matters covered by this code, unless expressly authorized by this code." Whether this statute preempts the traffic restrictions set forth in the settlement agreement presents a question of statutory construction for our independent review. (*Save the Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1179.)

Vehicle Code section 21 is inapplicable here. The settlement agreement is a contract, not an ordinance or resolution. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810-811.) Vehicle Code section 21 does not apply to contracts. (*Coldwell Banker Residential Brokerage Co. v. Superior Court* (2004) 117 Cal.App.4th 158, 165 [where statute enumerates what is affected by its provisions, others are impliedly excluded].) Thus, even though the state has occupied the field of traffic control, Moorpark can enforce the restrictions enumerated in the agreement as valid contractual terms. (See 42

10

Ops.Cal.Atty.Gen. 169, 172 (1963), cited with approval by *Alioto's Fish Co. v. Human Rights Com. of San Francisco* (1981) 120 Cal.App.3d 594, 605-606 (*Alioto's Fish*).)

Nor does the settlement agreement have the effect of an ordinance or resolution that conflicts with the purpose of the Vehicle Code. The purpose of Vehicle Code section 21 is to ensure uniformity of traffic rules throughout the state. (Veh. Code, § 21, subd. (a).) The haul route provisions in the agreement do not impede that goal. They do not close roads to traffic in general. They do not close roads to traffic going to or from the quarries. They do not even close roads to trucks picking up or hauling sand, provided those haulers are not connected to the beach restoration project. The agreement merely dictates the routes BBGHAD's contractors and subcontractors must use when working on the project.

None of the cases on which Appellants rely suggests that Vehicle Code section 21 is triggered here. In each case, a local government or homeowners' association enacted an ordinance or installed physical barriers to block traffic. (*Rumford v. City of Berkeley* (1982) 31 Cal.3d 545, 549; *City of Hawaiian Gardens v. City of Long Beach* (1998) 61 Cal.App.4th 1100, 1105; *Citizens Against Gated Enclaves v. Whitley Heights Civic Assn.* (1994) 23 Cal.App.4th 812, 816; *City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847, 854-855; *City of Lafayette v. County of Contra Costa* (1979) 91 Cal.App.3d 749, 752.) The settlement agreement, in contrast, involves no ordinance, resolution, or physical barrier that closes roads to traffic. There is no preemption problem.[2]

_____

[2] Based on our conclusion, we deny as moot Moorpark's October 26, 2017, motion to consider postjudgment evidence.

11

*Extraterritorial regulation*

Appellants contend the settlement agreement is an unlawful attempt by Moorpark to exercise its regulatory powers outside city limits under the guise of its contractual authority. We are not persuaded.

Subject to limited exceptions not applicable here, a city has "no extraterritorial powers of regulation," and "may not exercise . . . governmental functions beyond its corporate boundaries." (*City of Oakland v. Brock* (1937) 8 Cal.2d 639, 641.) But the prohibition against extraterritorial regulation "applies only where the local authority exercises its regulatory or police power as opposed to its contracting power." (*Burns Internat. Security Services Corp. v. County of Los Angeles* (2004) 123 Cal.App.4th 162, 167 (*Burns*).) A city has authority to enter into contracts that enable it to carry out its necessary functions, including those implied by necessity. (*Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 (*Morrison Homes*).) We independently review whether Moorpark has unlawfully attempted to exercise its regulatory power outside city limits. (*Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74.)

There is no extraterritorial regulation problem here. Trucks' use of roads can create a public nuisance. (*City & Co. of S.F. v. Safeway Stores, Inc.* (1957) 150 Cal.App.2d 327, 333.) Moorpark has attempted to abate that nuisance within city limits by signing a settlement agreement that designates permissible sand hauling routes for BBGHAD's contractors. (*Morrison Homes, supra,* 58 Cal.App.3d at p. 734.) Had BBGHAD found the agreement's route provisions overly burdensome, it could have refused to sign the agreement. (*Alioto's Fish, supra,* 120

Cal.App.3d at p. 605.)  Moreover, the remedies specified in sections 13 and 14 of the agreement—liquidated damages, specific performance, and injunctive relief—are contractual in nature, and inure primarily to Moorpark's benefit.  (*Ibid.*)  And they have effect only within Moorpark city limits.  (*Burns, supra,* 123 Cal.App.4th at p. 172.)  The agreement therefore represents a valid exercise of Moorpark's contracting power, not its regulatory power.  (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1177.)

*Abdication of police power*

Appellants contend BBGHAD abdicated its police power when it granted Moorpark the power to dictate the sand hauling routes BBGHAD's contractors must use during the life of the project, which renders the settlement agreement void in its entirety.  In its cross-appeal, Moorpark counters that there was no abdication of BBGHAD's police power, thus the trial court erred when it declared portions of the agreement void.  We conclude that portions of the agreement are void or subject to modification.

BBGHAD has the authority to "enter into contracts and agreements . . . in furtherance of the" beach restoration project.  (§ 26579.)  And as a creature of state law, BBGHAD may exercise a portion of the state's police power.  (*Rodeo Sanitary Dist. v. Board of Supervisors* (1999) 71 Cal.App.4th 1443, 1447; see § 26570.)  But BBGHAD may not contract away the right to exercise its police power in the future.  (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800, superseded by statute on another ground as stated in *Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1559, fn. 5.)

13

The determination of hauling routes is a police power.[3] (*McCammon v. City of Redwood City* (1957) 149 Cal.App.2d 421, 427.) Therefore, if the haul route provisions in the settlement agreement "amount[] to [BBGHAD's] 'surrender,' 'abnegation,' 'divestment,' 'abridging,' or 'bargaining away' of its control of a police power," those provisions are void. (*County Mobilehome Positive Action Com., Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727, 738 (*COMPAC*).) Whether BBGHAD contracted away its police power when it granted Moorpark control over potential changes to hauling routes is a question for our independent review. (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303.)

Sections of the settlement agreement are void because they surrender BBGHAD's discretion to alter haul routes in the future. The first sentence of section 7 states that "[t]he haul route prohibitions shall apply . . . throughout the duration of the [p]roject." The last clause of section 3 prohibits those hauling sand in connection with the beach restoration project from staging or parking trucks in or adjacent to Moorpark "at anytime [*sic*] for the duration of the [p]roject." These terms restrict BBGHAD's ability to respond to any change in circumstances during the 20-plus years of the project. A government entity may not surrender, for a potentially indefinite period of time, its

---

[3] Even if it were not, the same analysis would apply: Among BBGHAD's statutory powers is making improvements to lands. (§ 26580.) The hauling of sand qualifies as an "improvement." (§§ 26505, 26574, subd. (d).) We analyze BBGHAD's alleged abdication of that statutory power identically to the alleged abdication of a police power. (See *Trimont Land Co. v. Truckee Sanitary Dist.* (1983) 145 Cal.App.3d 330, 349-351 (*Trimont Land*).)

14

authority to exercise discretion on matters within its police power. (*COMPAC*, *supra*, 62 Cal.App.4th at pp. 739-741.) The terms are void.

Section 26 provides that the agreement "may be amended or modified only by the mutual agreement of the [p]arties and only when all [p]arties memorialize in writing their consent to amend or modify." This section gives Moorpark veto power over BBGHAD's authority to alter the haul routes to reflect changed circumstances. But the Public Resources Code vests those powers in BBGHAD. (See § 26580.) Thus, to the extent section 26 prohibits BBGHAD from approving or disapproving modifications to haul routes in light of changed circumstances, it is void. (*Trimont Land*, *supra*, 145 Cal.App.3d at p. 351.) It follows that the prohibited haul routes identified in the first sentence of section 2 and the first sentence of section 8, the prohibited staging and parking areas identified in section 3, the permitted haul routes identified in section 4, and the permitted emergency routes identified in the last sentence of section 5 are void to the extent they prevent BBGHAD from altering haul routes due to a future change in circumstances.

Respondents argue that the settlement agreement allows BBGHAD to alter haul routes in response to changed circumstances that may arise during the project's 20-year lifespan. They first assert that BBGHAD may acquire sand from sources not identified in the agreement. But neither the State Lands Commission nor the Coastal Commission approved BBGHAD's use of other sources of sand. And BBGHAD itself determined, after an "exhaustive search," that only three quarries have sand suitable for the project. Two of those quarries—CEMEX and Grimes Rock—are identified in the

15

agreement and subject to its restrictions. The third—P.W. Gillibrand—cannot supply a sufficient quantity of sand to meet project requirements.

Respondents also assert they retain the authority to alter haul routes by invoking the emergency exception set forth in section 5 if changed circumstances necessitate haul route modifications. But section 5 provides that an emergency exists only when a first responder determines that all lanes of State Highway 23 north of the quarries or all lanes of State Highway 126 west of Fillmore are closed to trucks, and ceases when at least one lane on both highways is open to truck traffic. By its very terms, the exception is temporary, and would only apply under extremely limited circumstances.

There are many scenarios in which BBGHAD cannot invoke the emergency exception. For example, BBGHAD cannot invoke the exception if traffic congestion increases along the designated haul routes or if there is a dramatic slowdown or partial road closure. BBGHAD cannot invoke the exception if increased costs or logistical issues at the quarries or project site require the use of a different route. And BBGHAD cannot invoke the exception should its board of directors or outside authorities decide that the additional pollution generated from the mandated use of a more circuitous route is unacceptable. In short, the settlement agreement, as written, does not allow for modifications to respond to changes in circumstances that may arise during the project's lifespan.

Respondents cite cases in which government entities did not improperly contract away police power because they preserved discretion to modify the applicable contract or ordinance in light of changed circumstances. (See *108 Holdings,*

16

*Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 195-197; *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 233 (*SMART*); *Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 591; *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823; *Morrison Homes*, *supra*, 58 Cal.App.3d at pp. 734-735.) But the sections of the settlement agreement we have identified do not preserve such discretion. Rather, they preclude BBGHAD from altering haul routes in response to changed conditions and, in effect, give Moorpark veto power over BBGHAD's proposed changes.

Moorpark argues the entire agreement is valid because BBGHAD had statutory authority to enter it. But simply because BBGHAD had the authority to execute the settlement agreement does not render all of its terms valid (Civ. Code, § 1550 [capacity to contract and object of contract are different elements]). By statute, BBGHAD's police power includes the designation of sand hauling routes. (§ 26580.) It must therefore retain authority to modify those routes in response to changed circumstances.

Finally, Moorpark argues the settlement agreement constitutes a valid exercise of BBGHAD's authority because project operations are limited to a total of 15 to 25 months over the span of 20 years. We disagree with Moorpark's characterization of hauling operations. If approved by BBGHAD and applicable permitting agencies, the project may last longer than 20 years, rendering the agreement's duration indefinite. And while the five *main* sand deposits may occur over a period of 15 to 25 months, the project may also entail an unspecified—and potentially unlimited—number of *supplemental* deposits.

17

More significantly, Moorpark did not raise this argument in the proceedings below. As a theory of defense, an argument may not be asserted for the first time on appeal. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 13, fn. 6.) The argument is forfeited.

But even if Moorpark had preserved its argument, it would not save the settlement agreement. Moorpark relies on our observation in *SMART*, *supra*, 84 Cal.App.4th at page 233, that the zoning freeze at issue there lasted only five years. But our holding in *SMART* turned on the county's retention of discretion under its agreement with the developer, not the duration of the freeze. (*Ibid*.) Thus, contrary to Moorpark's contention, *SMART* does not limit our analysis to the specified duration of actual hauling operations.

Nor do the additional cases it cites. All of these cases turn on the government's abdication of power, not the duration of that abdication. (See *Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 937; *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 181-183; *COMPAC*, *supra*, 62 Cal.App.4th at pp. 738-741; *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1778-1780; *Trimont Land*, *supra*, 145 Cal.App.3d at pp. 350-351; *Carty v. City of Ojai* (1978) 77 Cal.App.3d 329, 342-343.) It is BBGHAD's surrender of its discretion to approve or disapprove hauling routes, not just the duration of the agreement's operation, that runs afoul of the principle that a government entity may not contract away its police power.

*Severability*

Because we have determined that portions of the settlement agreement are invalid, we must determine whether

18

the agreement is void in part or in its entirety.  Our goal in construing the agreement is to give effect to the parties' mutual intentions (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321), keeping in mind our responsibility to interpret the agreement to "make it lawful, operative, definite, reasonable, and capable of being carried into effect" (Civ. Code, § 1643).

Where an agreement has several objects, some of which are lawful and others of which are unlawful, it is "void as to the latter and valid as to the rest."  (Civ. Code, § 1599.)  We look to the various purposes of the agreement to determine if it is severable.  (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124.)  If the "central purpose of the [agreement] is tainted with illegality," then the agreement as a whole cannot be enforced.  (*Ibid*.)  But if the illegality is "collateral to the main purpose of" the agreement, and "the illegal provision can be extirpated . . . by means of severance or restriction," then severance and restriction are appropriate.  (*Ibid*.)  Our overarching inquiry is whether the interests of justice would be furthered by severance.  (*Ibid*.)

They would.  The settlement agreement has at least two purposes:  (1) the determination of permissible and prohibited sand hauling routes, and (2) the duration of and limited discretion to modify the route restrictions.  Only the latter of these purposes is unlawful.  Because that can be extirpated from the agreement, the former may remain in force.  (*Trimont Land*, *supra*, 145 Cal.App.3d at p. 355.)

Severance also gives effect to Respondents' expressed intentions.  Section 23 of the agreement provides:  "Should any provision of this Agreement be declared or determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable,

19

the invalidity, illegality, or unenforceability shall not affect any other provision of the Agreement and the remainder of the Agreement shall be construed as if the invalid, illegal, or unenforceable provision had never been included." This clause "evidence[s] [Respondents'] intent that, to the extent possible, the valid provisions of the [agreement] be given effect, even if some provision is found to be invalid or unlawful." (*Baeza v. Superior Court* (2011) 201 Cal.App.4th 1214, 1230.) The agreement is not void in its entirety.

DISPOSITION

We reverse the portion of the judgment that grants Appellants' request for declaratory relief, and remand the matter to the trial court with directions to vacate the declaratory relief previously granted and to enter new and different declaratory relief that:  (1) declares void the last clause of section 3 and the first sentence of section 7 of the settlement agreement; (2) declares void section 26 to the extent it prohibits BBGHAD from approving or disapproving modifications to haul routes in light of a future change in circumstances; and (3) requires the haul routes identified in the first sentence of section 2 and the first sentence of section 8, the prohibited staging and parking areas identified in section 3, the permitted haul routes identified in section 4, and the permitted emergency routes identified in the last sentence of section 5 to be subject to modification should BBGHAD need to alter haul routes in the future in response to changed circumstances.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

CERTIFIED FOR PUBLICATION.


TANGEMAN, J.

We concur:


GILBERT, P. J.


YEGAN, J.


21

Thomas Pearce Anderle, Judge

Superior Court County of Santa Barbara

———————————————

Leroy Smith, County Counsel, Jeffrey E. Barnes, Assistant County Counsel, for Plaintiff and Appellant County of Ventura.

Aleshire & Wynder and June Ailin, for Plaintiff and Appellant City of Fillmore.

Kevin G. Ennis, City Attorney; Richards, Watson & Gershon, T. Peter Pierce and Nicholas R. Ghirelli, for Defendant and Appellant City of Moorpark.

Elkins Kalt Weintraub Reuben Gartside, John M. Bowman and Ernest J. Guadiana, for Defendant and Respondent Broad Beach Geologic Hazard Abatement District.